Sheila Kay COBB KING, individually and as administratrix of the estate of Tip Edward Cobb, Jr., deceased, Plaintiff–Appellant,

v.

LIBERTY MUTUAL INSURANCE CO., Defendant–Appellee.

No. 01–5738.

United States Court of Appeals, Sixth Circuit.

Jan. 9, 2003.

Before MARTIN, Chief Judge; and NELSON and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Sheila Kay Cobb King brought this suit against Liberty Mutual Insurance Company, alleging violations of the Kentucky Unfair Claims Settlement Practices Act (KUCSPA) and a common law claim of bad faith. The district court granted summary judgment to Liberty Mutual on the ground that King had not offered evidence of conscious wrongdoing or recklessness by the company. For the reasons set forth below, we REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion

## I. BACKGROUND

This case arises from a 1984 car accident that injured King and killed her husband, Tip Edward Cobb. The accident occurred as King and her husband were driving through a portion of a Kentucky highway that was under construction. King filed a wrongful death action on behalf of her husband's estate in 1984, alleging negligence by Kentucky Stone Company, Inc., the company in charge of the construction. Kentucky Stone was insured by Liberty Mutual. According to King, her lawsuit against Kentucky Stone was settled in 1987 for $15,000, with $5,000 paid to her

lawyer at that time. King further claims that the settlement agreement required Liberty Mutual to use the remaining $10,000 to purchase two annuities, one for herself and the other for her minor stepson, Justin Cobb. The annuity payments to King and Cobb were to begin when Cobb reached the age of 18.

When Cobb turned 18 some nine years after the settlement, neither he nor King received any payments from the annuities. Shortly thereafter. King's sister made several inquiries into the matter with Liberty Mutual. (King herself was unable to call Liberty Mutual because she does not have a telephone or access to one during business hours.) King's sister was told that Liberty Mutual could not access the claim without the claim number, which King did not have. When Liberty Mutual continued to deny any knowledge of the settlement or the annuities, King retained a lawyer to assist her. King's lawyer sent two demand letters to Liberty Mutual and, when the company did not respond after several months had passed, filed this lawsuit for recovery of the amounts due under the settlement agreement, for violations of KUCSPA, and for common law bad faith.

The facts as alleged by King are disputed by Liberty Mutual. It contends that although settlement negotiations clearly occurred in the underlying suit, there is no evidence as to their ultimate result. Throughout this litigation. Liberty Mutual has refused to concede the existence of a settlement. King does not have any documents regarding the settlement, except for one letter from her attorney that vaguely refers to the annuities. The files kept by the lawyers on each side in the underlying suit have been destroyed. Both lawyer's confirmed, however, that the case was settled and that annuities were supposed to have been purchased by Liberty Mutual. Court records further indicate that the

original wrongful death suit had been scheduled for trial and that jury instructions were submitted. But the trial never occurred, a fact that suggests that the case was settled.

Shortly after King filed her complaint in February of 1999, and nearly three years after King first requested what was due to her under the settlement agreement, Liberty Mutual offered $2,500 to settle. King refused the offer. Liberty Mutual subsequently stated in its initial disclosures to King that "[a]t this time. Liberty Mutual is aware of no documents to be disclosed pursuant to Fed. R. Civ. 26(a)(1)(B)." Nearly six months later, however. Liberty Mutual searched its purged files and turned over the remnants of King's claim file. The file contained several documents discussing the settlement and the annuities that were to have been purchased. One of these letters stated that Liberty Mutual was "waiting for information the plaintiff was to produce so that we can produce the annuities agreed upon as settlement of this litigation." A subsequent letter stated that all necessary information had been received from the plaintiff. Additionally, a note in the file states that Donna Leaman would handle the issuance of the annuities. Another letter revealed that "[t]he total settlement is $15.000 for all claims."

Liberty Mutual employee Don Hardee, who was assigned to handle King's case, testified in his deposition that upon receiving a demand letter from King's attorney in 1998, he telephoned the attorney who had handled the original case for Liberty Mutual. Hardee said in his deposition that he could not recall the specifics of this conversation, but that the lawyer had told him that the underlying case "may" have been settled. Documents subsequently turned over pursuant to the magistrate judge's order, however, demonstrate that in these phone conversations with the attorney, Hardee in fact learned that the underlying claim had been settled, and that the settlement included two annuities to be paid when Cobb reached the age of majority. King's allegations that Liberty Mutual owed her money had thus been confirmed by Liberty Mutual's own lawyer before King filed her lawsuit, and months before Liberty Mutual made the $2,500 settlement offer to King in early 1999.

Liberty Mutual eventually offered to pay the present value of the settlement amount identified in the recovered file, plus interest and costs. This totaled approximately $15,000. King and Cobb accepted the offer in October of 1999, but reserved the right to pursue their claims for bad faith. In April of 2001. the district court granted Liberty Mutual's motion for summary judgment on both the statutory and common law bad faith claims. This appeal followed.

## II. ANALYSIS

### A. Standard of review

A district court's grant of summary judgment is reviewed de novo. *Sperle v. Michigan Dept. of Corr.* 297 F.3d 483, 490 (6th Cir.2002) (en banc). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Common law bad faith

As the district court noted, "Kentucky law adheres to a single test 'applicable to all bad faith actions, whether brought by a first-party claimant or a third-party claimant, and whether premised upon common law or a statutory violation.' Accordingly[,] the plaintiff's UCSPA and common law bad faith claims are analyzed together" (internal citation omitted).

### C. Kentucky's Unfair Claims Settlement Practices Act

■ The Kentucky Supreme Court has held that KUCSPA is intended "to protect the public from unfair trade practices and fraud," and therefore "should be liberally construed so as to effectuate its purpose." *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky.1988). KUSCPA prohibits insurance companies in Kentucky from engaging in 14 specific unfair practices. KRS § 304.12–230. King alleges that Liberty Mutual violated the following subsections:

(1) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

. . .

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

. . .

(14) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

*Id.*

Liberty Mutual contends that King's claims "are nothing more than ones for breach of contract . . . [and] there is nothing to support the idea that a breach of contract claim can be shoehorned into the UCSPA merely because the contract in question resulted from the settlement of a claim that related to a policy of insurance." It urges us to adopt the position that once a settlement agreement is reached, the insurance company's actions are outside the purview of KUCSPA. We decline to adopt this position, however, because the Kentucky Supreme Court has explicitly stated that KUCSPA "applies only to insurance companies and their agents in the negotiation, *settlement and payment* of claims made against policies, certificates or contracts of insurance." *Davidson v. American Freightways, Inc.* 25 S.W.3d 94. 98 (Ky.2000) (emphasis added).

Furthermore, the statute by its own terms applies to "any unfair or deceptive act or practice in the business of insurance." KRS 304.12–010. We decline to hold that payment pursuant to a settlement agreement by an insurance company falls outside the scope of "the business of insurance." Until the claim is finally settled and paid in full, we conclude that the processing of the claim is not final and the transaction is still covered by KUCSPA.

Third party claimants are entitled to bring a cause of action for damages when an insurance company violates any of the provisions of KUCSPA. *State Farm v. Reeder*, 763 S.W.2d 116 (Ky.1988). Under Kentucky law, "an insured must prove three elements in order to prevail against

an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer v. Jones* 864 S.W.2d 885. 890 (Ky.1993).

■ A plaintiff seeking punitive damages for bad faith must also meet an additional standard. "Before the cause of action exists in the first place, there must be evidence sufficient to warrant punitive damages.... This means there must be sufficient evidence of intentional misconduct or reckless disregard of the rights of an insured claimant to warrant submitting the right to award punitive damages to the jury." *Id.* The district court in the case before us did not reach the three-part test outlined in *Wittmer,* but rather held that King failed to meet this threshold standard. In so doing, the district court relied on the fact that "[b]ecause the plaintiffs cannot produce a copy of the alleged settlement agreement, they cannot show that the defendant deliberately failed to pay pursuant to any such agreement." We disagree with this conclusion of the district court.

Kentucky law does not require contractual obligations to be in writing in order to be binding. *Motorists Mutual v. Glass,* 996 S.W.2d 437, 445 (Ky.1997) (holding that the testimony of a structured settlement specialist was alone sufficient to create a jury issue as to whether automobile insurers and an accident victim had reached a settlement). Thus, the fact that King failed to produce a written settlement agreement is not dispositive as to whether Liberty Mutual breached its obligations pursuant to a settlement with her. We conclude that there is sufficient evidence, including the lawyers' depositions, the notes from Liberty Mutual's files, and King's own testimony, from which a reasonable jury could find that there was a binding settlement agreement, and that Liberty Mutual failed to pay according to its terms.

■ This leads us to the merits of King's bad faith claim. To start with, we agree with the dissent's analysis that none of Liberty Mutual's actions in what the dissent refers to as "Chapter 1" and "Chapter 2" can reasonably be construed as more than simple negligence. With regard to "Chapter 3," however, commencing with Justin Cobb's 18th birthday on November 3, 1996, we believe that a genuine issue of material fact exists as to whether Liberty Mutual's actions amounted to a reckless disregard for King's rights under the insurance policy in question.

In our opinion, the district court erred in not recognizing that King has presented evidence in two areas that raise genuine issues of material fact concerning her claim that Liberty Mutual acted in reckless disregard of her rights under the policy settlement. The first of these areas relates to Liberty Mutual's failure to check its purged file records until 18 months after King's sister began inquiring about the settlement in January of 1998, 9 months after King's lawyer first contacted Liberty Mutual in October of 1998, 9 months after the existence of a settlement was confirmed by Liberty Mutual's own attorney in October of 1998, and 5 months after King filed her lawsuit in February of 1999. A check of the purged file records under the facts of this case seems such an obvious place to begin a conscientious search for the missing information, especially since it was this very action in July of 1999 that promptly led to the recovered

files. We believe that a reasonable jury could find that this inexplicable delay belied Liberty Mutual's contention—and the district court's finding—that Liberty Mutual diligently attempted to locate documents pertaining to King's claim. This is particularly so in light of the fact that Liberty Mutual was able to locate what was left of King's file within a day after being ordered to do so by the magistrate judge.

The second area that we believe raises a genuine issue of material fact as to Liberty Mutual's alleged bad faith concerns the knowledge possessed by Liberty Mutual's employee Hardee at the time that he was in contact with King and her attorney, M. Austin Mehr. King presented proof that Hardee verified the existence of a settlement in a phone conversation that he had with Liberty Mutual's original attorney, F. Preston Farmer, in October of 1998. This is reflected in an email message sent to Liberty Mutual's Cleveland office that reported that, according to Farmer, King's case had been settled and some type of annuity was to be purchased. Yet Hardee equivocated in his December 15, 1999 deposition about what he had been told by Farmer concerning the settlement, claiming that "I don't recall him saying that the case had been settled. He thought it may have been settled, as best I recall his words." This apparent misrepresentation, when combined with the "low ball" $2,500 offer of settlement made by Liberty Mutual in April of 1999, would permit a reasonable jury to find that Liberty Mutual had acted in reckless disregard of King's rights under the policy settlement. In sum, we believe that there is sufficient "proof or evidence supporting a reasonable inference that the purpose of the delay [in payment] was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage" to justify sending this question to the jury. *Motorists Mu-*

*tual v. Glass,* 996 S.W.2d 437, 453 (Ky. 1997).

Because we believe that King survives the threshold test, we turn next to the three prongs set forth in *Wittmer* The first prong is satisfied because a reasonable jury could find that Liberty Mutual had a contractual obligation to pay King based on the evidence submitted. Second, Liberty Mutual had no legal or factual basis for denying the claim, assuming that the jury finds that a binding settlement was reached. Nothing had changed in the intervening years to alter Liberty Mutual's legal obligation to pay King according to the terms of the settlement. The fact that Liberty Mutual claims to have misplaced its file regarding an open obligation does not change the legal force of that underlying obligation. Finally, the evidence supporting the proposition that Liberty Mutual either knew there was no reasonable basis for denying the claim or that it acted with reckless disregard for whether such a basis existed has already been discussed in connection with the threshold test for punitive damages under *Wittmer v. Jones.* 864 S.W.2d 885, 890 (Ky.1993).

Our analysis thus leads to the conclusion that the district court erred in granting summary judgment in favor of Liberty Mutual. This is not to say that the ultimate outcome is foreordained, because a jury might well find that Liberty Mutual has not exhibited bad faith in regard to King's claim. But we do believe that King has raised genuine issues of material fact the preclude the summary disposition of this case.

## III. CONCLUSION

For all of the reasons set forth above, we REVERSE the judgment of the district court and REMAND the case for

further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, dissenting.

NELSON, Circuit Judge.

I am an agnostic on the question whether Kentucky's Unfair Claims Settlement Practices Act, KRS 304.12–230—a statute that on its face seems applicable only to the handling of insurance claims as such—applies to situations where a claim has been settled by an insurance company and the company is subsequently accused of failing to honor the settlement contract. It is true that subtitle 12 of Chapter 304 of the Kentucky Revised Statutes—the subtitle of which the UCSPA is a part—begins with a section (enacted long before the UCSPA) that broadly prohibits any person from engaging in, among other things, "any unfair or deceptive act or practice in the business of insurance." See KRS 304.12–010. Carrying out settlement agreements is clearly part of the business of insurance, so § 12–010 itself clearly applies to the situation posited. It is not entirely clear to me, however, that § 12–010 justifies an expansive reading of § 12–230, the section embodying the UCSPA. Neither is it entirely clear to me that a definitive answer is provided by the decision in *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94 (Ky.2000). where the Kentucky Supreme Court held that the UCSPA does not apply to self-insurers.[1]

For purposes of analyzing the case before us, however, I am content to assume that Liberty Mutual remained subject to the UCSPA even after it finally succeeded in pinning down Mrs. King's lawyer on the details of the settlement. As the district court recognized, and as our panel's majority opinion affirms, "Kentucky law adheres to a single test 'applicable to all bad faith actions ... whether premised on common law or a statutory violation.'" Under either premise, I believe, Mrs. King can recover on her bad faith claim only if she can prove that Liberty Mutual was guilty of "intentional misconduct" or "reckless disregard" of her rights. See *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky.1993).[2] Af-

---

1. At page 98 of its opinion, the *Davidson* Court applied the principle that ambiguity in a statute may be resolved by acceptance of "a long-standing interpretation given to the statute by the agency charged with its administration." In this connection, the Court made reference to 806 Ky. Admin. Regs. 12:095. a state insurance commission regulation implementing the UCSPA. "Section 2 of that regulation." the Court observed. "describes its scope and purpose as 'to set forth minimum standards for the investigation and disposition of property and casualty insurance claims *arising under policies. certificates, and contracts.*'" *Id.* (Emphasis by the Kentucky court.) (I note parenthetically that the "policy," "certificate," or "contract" trilogy is defined in the regulation as "any contract of insurance or indemnity"—a definition that does not seem to cover settlement contracts. See 806 KAR 12:095 § 1(10).)

   "Without detailing every section of 806 KAR 12:095," the *Davidson* Court continued, "suffice it to say that this comprehensive reg-

ulatory scheme applies only to insurance companies and their agents in the negotiation, settlement and payment of claims made against polices, certificates or contracts of insurance." *Davidson*, 25 S.W.3d at 98. The provisions in the regulation relating to "payment" do not seem relevant to the case at bar, with the possible exception of one that says insurers "shall tender payment within thirty (30) days of affirmation of liability, if the amount of the claim is determined and not in dispute." See 806 KAR 12:09 § 6(6). Of at least equal interest, perhaps, is a provision stating that claim data "shall be available for all open and closed files for the current year and the five (5) preceding years." 806 KAR 12:095 § 3(1).

2. The trial court concluded in *Wittmer* "that there was not sufficient proof that State Farm was involved in intentional misconduct to warrant punitive damages...." *Wittmer*, 864 S.W.2d at 890. The Kentucky Supreme Court agreed, and went on to hold that *"by the same*

ter a careful review of the entire record of the case at bar, including all of the decade-old documents ultimately recovered from Liberty Mutual's storage facility in Stoughton, Massachusetts. the district court found that there was no evidence of conscious wrongdoing or reckless disregard on Liberty Mutual's part. Given the chronology that I shall now attempt to outline. I fully agree that Mrs. King failed to show the existence of a genuine issue as to "intentional misconduct" or "recklessness." I would therefore affirm the summary judgment in favor of Liberty Mutual.

## I

The story of what seems to have happened here—to the extent that what happened is ascertainable—can be divided into three chapters. Chapter one begins in July of 1984, when Tip Edward Cobb, Jr., was killed in an automobile accident at a highway construction site. The chapter ends with his widow's acceptance (or what a rational jury could readily infer was her acceptance) of Liberty Mutual's proposed settlement terms on October 28, 1988.

In November of 1984, proceeding individually and as administrator of the decedent's estate, Mr. Cobb's widow (who has since remarried and is now known as Sheila Kay Cobb King, the name I shall use henceforth) brought a wrongful death action in Kentucky's Laurel Circuit Court against Liberty Mutual's insured, the Kentucky Stone Company. Mrs. King was represented by attorney Paul E. Braden, who at that time was part of a two-man law practice in Corbin, Kentucky, Liberty Mutual engaged attorney F. Preston Farmer, of a law firm in London, Kentucky, to defend Kentucky Stone.

The Laurel Circuit Court set October 22, 1987, as the date for trial of the wrongful death action. The case never went to trial, however, because at or near the assigned date the lawyers reached general agreement on a settlement. A few of the details of the settlement evidently remained to be filled in later.

We know now that the total dollar amount of the settlement, all to be paid by Liberty Mutual, was $15,000. Mrs. King's lawyer. Mr. Braden, was to receive the one third share specified in his contingent fee contract. Another third was to be used for the purchase of an annuity for Mrs. King. The remaining third was to go for an annuity payable to the decedent's son (Mrs. King's stepson), Justin Edward Cobb. Justin was nine years old at the time.

There may well have been talk of structuring Justin's annuity so that the annuity payments would begin on his 18th birthday. Years later, in any event, it would be Mrs. King's recollection that this is when the payments were to start. As we shall see in due course, however, Liberty Mutual was ultimately instructed to have the payments begin at a time before Justin's eleventh birthday.

The documents that have now been recovered make it crystal clear that Liberty Mutual was eager to get the information it needed for purchasing the annuities and wrapping up the settlement. As early as November 22, 1987, the claims manager in Liberty Mutual's Lexington office, Paul E. Wilkins, wrote defense counsel Farmer a letter reminding him that "I [Wilkins] am waiting for information [that] the plaintiff was to provide so that we can produce the annuities agreed upon as settlement of this

token State Farm was entitled to a directed verdict on the claim of statutory bad faith."

*Id.* (Emphasis supplied).

litigation." Claims Manager Wilkins went on to say that although he assumed plaintiff's attorney Braden had not yet given the information to Farmer, he (Wilkins) wanted to make sure that he and Farmer would not be "accused of failing to follow through with the settlement."

In the first part of December, 1987. Braden sent Farmer birth certificates for Mrs. King and Justin. Their Social Security numbers were also provided, along with information as to who their beneficiaries would be if they died while annuity payments were still due.

Farmer relayed this information to Liberty Mutual's Wilkins on December 17, 1987, telling Wilkins that "I have finally received information from the Plaintiff's attorneys which should enable us to conclude a settlement." Mr. Farmer asked to be advised if further information were needed, and he requested a $5,000 check (undoubtedly to cover Mr. Braden's fee) payable to the plaintiff and her attorneys.

On December 20, 1987, Wilkins forwarded Farmer's letter and its attachments to a woman named Donna Leaman in the claims department in Liberty Mutual's home office in Boston. Wilkins confirmed that "[t]he total settlement is for $15000.00 for all claims," and he told Ms. Leaman that the $5,000 check requested by Farmer would be issued out of the Lexington office.

On the same day—December 20, 1987—Wilkins sent the requested $5,000 check to Farmer. (Wilkins did so, interesting enough, without benefit of a signed settlement agreement.) The concluding paragraph of Wilkins' transmittal letter to Farmer read as follows:

"Please deliver the attached check to the plaintiff attys when you deem appropriate. We will of course need a release and order of dismissal of the suit filed in the Laurel Circuit Ct."

Mr. Farmer seems to have deemed it appropriate to deliver Liberty Mutual's $5,000 check to plaintiff's counsel without waiting to see a release and order of dismissal. Mrs. King did not sign a release, as far as we know, and attorney Braden never signed a settlement order dismissing his client's wrongful death case with prejudice.

It turned out that Ms. Leaman, in Liberty Mutual's home office, did not have all the information she needed. As we know from a memorandum she sent Mr. Wilkins on February 18, 1988. Ms. Leaman called attorney Farmer to get further information on Justin Cobb's beneficiaries, his attorney's name and address, and the address where the annuity checks should be sent. More significantly. Ms. Leaman advised Mr. Wilkins in her memorandum that "I don't have a clue as to how these people each want their [$]5,000 annuity [to be structured]."

Ms. Leaman went on to explain that she needed input on what the actual provisions of the annuities were to be. In this connection she attached computer printouts illustrative of the options available. In Justin's case, as the printouts showed, it would be possible to buy an annuity that would pay $427.75 a year for 20 years, guaranteed, with the first payment to made one year from the date of acceptance. A second option would be a lump-sum payment of $9,243 to be made on November 3, 1996, Justin's 18th birthday.

As to Mrs. King, the memorandum said, she could opt to receive a payment of $357.84 per year for life, with a 20–year guarantee, the first payment to be made one year from the date of acceptance. A second option would be an annual payment of $458.75, also for life, with a 20–year guarantee, but with the first payment to be made five years from the date of agree-

ment. The memorandum cautioned that these samples were only "models" and "may or may not reflect true final figures."

Ms. Leaman's memorandum requesting input on the structure of the annuities was duely forwarded to attorney Farmer. Mr. Farmer subsequently reported that he set out the alternatives in a letter sent Mrs. King's counsel on April 11, 1988.

Toward the end of the following month Wilkins wrote Farmer to inquire again "where we are in getting the final settlement...." Wilkins asked if "the plaintiffs atty [has] given you the information needed to issue the annuity for the minor child." After adding that he wanted to make sure Farmer was not waiting on him (Wilkins) for anything, Wilkins concluded his letter with this sentence: "Whatever the problem, lets see if we can get these cases closed soon." Again, this is *Liberty Mutual* talking.

On June 1, 1988, Farmer confirmed to Wilkins that he wasn't waiting on anything from Wilkins' office: "We are ... instead waiting for the plaintiff's attorney to make some election." After explaining that he had set out the "alternative annuities" for both Mrs. King and Justin Cobb on April 11, 1988, Farmer said that Braden had still not indicated which of the alternatives his clients were interested in.

Through Mr. Wilkins, Liberty Mutual made still another inquiry on September 16, 1988. Farmer's response, dated September 19, is worth quoting *in extenso:*

"I have written to the counsel for the plaintiff several times, and called him on several occasions, requesting the necessary information in order to have the annuities issued and close out this file.

"They don't answer my letters and don't return my phone calls, except when I catch them in the office, and then they promise they will get that done right away.

"The only explanation I can offer is that Mark Glastetter, one of the members of this two member firm, recently left the firm and moved to New York; leaving Paul Braden as the only attorney in that firm. He is probably overworked, as well as being a terrible procrastinator. "I will keep pushing them for the necessary information so that we can close out this matter, and I will keep you advised."

Mr. Braden finally responded to Mr. Farmer's repeated inquiries on October 5, 1988, advising in a letter of that date that he had been informed Justin's annuity would be $427.75 per year for 20–years guaranteed, beginning one year from the date of acceptance. (The reader may recall that this was the first example for Justin in Ms. Leaman's memorandum of February 18.) Mrs. King's annuity. Braden continued, would be $458.75 a year for life, with 20 years guaranteed, to begin five years from the date of agreement. This was the second example Ms. Leaman had given for Mrs. King.

Attorney Farmer forwarded Braden's letter to Wilkins on October 17, 1988, noting in his transmittal letter that he assumed that Wilkins would make the necessary arrangements with Liberty Mutual to have the annuities issued. Wilkins promptly sent the letter to Donna Leaman at the home office.

By a message faxed to Mr. Wilkins on October 27, 1988, Ms. Leaman reported that because of interest rate changes in the more than eight months that had elapsed since she had prepared her original models, the figure for Justin would now be $464.97 per year for 20 years guaranteed, payment to begin on October 1, 1989. For Mrs. King, the message stated, the annual payment would be $437.80 for

life, with a 20 year guarantee, payment to begin on October 1, 1993.

The figures quoted would be good for two days, Ms. Leaman's message said, so Mr. Wilkins was asked to present these figures to Mr. Braden "immediately." "Let me know his response," Ms. Leaman continued. "so I can issue the check to the Life Co. in the two day time frame." (This indicates that the annuities were to be issued by Liberty Mutual's life insurance affiliate rather than an outside company.) "Also," the message requested, "please review the beneficiaries [for Mrs. King] as I mentioned in earlier memos." (Mrs. King's beneficiaries had previously been identified as "children then living (Melisa & Joseph)." Ms. Leaman, who had mistakenly thought that Justin was Mrs. King's child too, had asked if the designation of beneficiaries needed to be tightened up.)

In a hand written entry at the bottom of his copy of Ms. Leaman's message, Mr. Wilkins noted that he called Paul Braden, who indicated that only Melisa and Joseph should be named beneficiaries. The note, signed by Mr. Wilkins and dated October 28, 1988, concludes thus: "I called Donna Leaman at 9:50 AM + gave her requested info—she will handle."

Here endeth the first chapter as far as the written record is concerned. It is a chapter, in my view, from which no rational jury could possibly draw an inference of wrongdoing on the part of Liberty Mutual. As of October 28, 1988, at least, it is perfectly obvious that Liberty Mutual—which had already demonstrated its good faith by paying the plaintiff's attorney his full fee without benefit of a signed settlement agreement—wanted to get the annuities issued in a form acceptable to Mrs. King and her lawyer so that settlement could be wrapped up with a release and an order of dismissal, as mentioned in Mr. Wilkins' letter of December 20, 1987.

II

Chapter 2 of the story begins on October 28, 1988, and ends with Justin Cobb's 18th birthday on November 3, 1996. In contrast to its predecessor, Chapter 2 consists mainly of long silences.

For almost a full year, from October 28, 1988, to October 23, 1989, the written record is a total blank. Donna Leaman should have delivered a $10,000 check to the life insurance company for purchase of the annuities, but it appears unlikely that she did so. (In January of 2000, as I shall explain in Chapter 3, Ms. Leaman testified—perhaps erroneously—that she was still missing some data she needed and that she had asked attorney Farmer to obtain it.) If the life insurance company received the check, it should have issued the annuity contracts—but there is no record of its having done so. Justin Cobb should have received his first annuity payment shortly after October 1, 1989, but he didn't Liberty Mutual should have received a release, but no release was forthcoming. The wrongful death case should have been dismissed with prejudice, but it wasn't. We do not know for sure what happened, but a jury would certainly be justified in concluding that the ball had been given to Liberty Mutual on October 28, 1988, and Liberty Mutual somehow dropped it.

One year later, on October 23, 1989, plaintiff's attorney Braden sent a letter to defense counsel Farmer concerning the still-pending wrongful death case. This letter has not been found, but Braden was evidently asking about the annuities. We have Mr. Farmer's reply, which was dated October 30, 1989; in it, Farmer says "I have written Liberty Mutual today inquiring about the annuities, and I will advise you just as soon as I hear from them."

Mr. Braden apparently forwarded the letter to Mrs. King. It was the only document she received in connection with the settlement.

If Mr. Farmer ever heard back from Liberty Mutual, there is no record of it. Years passed without any activity on the case, as far as we can tell. On April 13, 1993, the Laurel Circuit Court dismissed the wrongful death action without prejudice for want of prosecution. Mrs. King did not start receiving annuity payments in October of 1993, as she should have done, and Justin Cobb was still not receiving his annuity payments.

Liberty Mutual closed its Lexington office in 1993. Paul Wilkins retired on July 1 of that year, and his files, or some of them, eventually found their way to the storage facility maintained by Liberty Mutual in Stoughton, Massachusetts. Attorney Braden also closed shop in 1993, leaving the practice of law to become a district judge; in 1996, after a brief return to practice, he became a circuit judge. Braden's files were lost somewhere along the line, probably at the time of a 1992 office move. Mr. Farmer's files were sent off to storage and then destroyed several years before the present action was commenced. Memories faded. As far as the fate of the settlement is concerned, the words "Bermuda Triangle" come to mind.

What could a reasonable jury infer from all this? Certainly that Liberty Mutual was in breach of its contractual obligation, and quite possibly that the company had been negligent. Whatever went wrong, a jury could obviously find that Liberty Mutual had assumed an obligation for issuance of the annuities and, not having issued them, should be held responsible for making Mrs. King and Justin Cobb whole.

It is one thing to make the obligees whole, however, and quite another thing to give them punitive damages too. It is not at all obvious, at least from what I have covered in the first two chapters of the story, that a jury could reasonably find Liberty Mutual guilty of intentional misconduct or reckless disregard of the obligees' rights. A finding that Liberty Mutual was consciously trying to stiff Mrs. King and Justin for $10,000, or was recklessly indifferent to their rights, would be permissible only if supported by evidence of a mental state which, in my judgment, cannot reasonably be imputed to anyone on the basis of the existing record of what transpired up to November of 1996.

Material evidence of conscious wrongdoing or reckless indifference on Liberty Mutual's part is conspicuous solely by its absence. The record summarized in Chapter 1 makes it clear, moreover, that the plaintiff could sustain her burden of proof only by showing that the good Dr. Jeckle whom Liberty Mutual resembled initially somehow turned into an evil Mr. Hyde after October of 1988. No such showing can be made, in my view, on the basis of what is known concerning the time frame that ended with Justin's 18th birthday. It remains to be considered, then, whether the record of events subsequent to Justin's 18th birthday somehow changes the picture. I do not believe it does.

### III

Justin Cobb turned 18 on November 3, 1996. Nothing happened then, of course, as far as any annuity payment was concerned.

Mrs. King herself never contacted Liberty Mutual about the annuities. In January of 1998, however. Mrs. King's sister, Brenda Vanzant, began telephoning various Liberty Mutual offices on Mrs. King's behalf. Ms. Vanzant explained that Mrs. King had settled a wrongful death action many years before and had never been

paid. No supporting documentation was offered, as far as we know, and Ms. Vanzant could not furnish Liberty Mutual a claim number. The employees who fielded these calls told Ms. Vanzant that they could not assist her without a claim number.

On October 14, 1998—two weeks shy of a full decade after the details of the annuities seem to have been pinned down—Mrs. King, in her capacity as administrator of the estate of Tip Edward Cobb, Jr., filed a two-paragraph accounting with the Probate Court for Whitley County, Kentucky. The first paragraph of the accounting explained that no assets of the estate had come into the administrator's hands. The second paragraph read as follows:

> "There was a settlement in wrongful death action filed against the Kentucky Stone Company. Attached is a letter dated October 30, 1989 from Attorney Preston Farmer to Paul Braden indicating he was inquiring about certain annuities which Liberty Mutual was to issue. I never received any cash as executrix or individually. There was apparently a small cash payment up front in the settlement which went to pay the attorney's fees. It was my belief that I was to receive an annuity as was my step-son, the son of the decedent. However, those cannot be located and apparently were never issued. That is being investigated by my lawyer, Austin Mehr."

M. Austin Mehr. Mrs. King's newly retained counsel, apparently began his investigation in September, 1998, with a telephone call to one Barbara Willock in Liberty Mutual's Louisville office. Mr. Mehr followed up on this call with a letter faxed to Ms. Willock on September 30, 1998. Accompanying the letter were copies of the complaint and answer that had been filed in the wrongful death case. These pleadings, the letter said hopefully,

"should provide information towards locating the 1989 case file."

On October 12, 1998, Mr. Mehr also sent a letter of inquiry to one of the Lexington law firms that did work for Liberty Mutual. This inquiry, accompanied by a copy of the October 30, 1989, letter in which Preston Farmer spoke of "the annuities," was referred to Donald H. Hardee, a claims analyst in Liberty Mutual's Louisville office.

Mr. Hardee had no personal knowledge of the case, so on the morning of October 28, 1998, he telephoned Mr. Farmer. Later the same morning Hardee sent an electronic message to Liberty Mutual's Cleveland office in which he gave the following summary of the information he had received from Farmer:

> "I'm told it was a lawsuit involving several clts ... Mr. Farmer defended Ky Stone for us ... One case was dfts verdict and the other clts elected to settle for a nominal amount ... Case style: Sheila Cobb, adms of the estate of Tip Cobb, Jr ..... 7/26/84 was the accident date.... Am told that the child involved is now of majority and that an annuity of some $1500 or $2500 was to be paid. * * * Mr. Farmer says his filed destroyed ... The atty who prosecuted for the wife (Mr. Braden) is now a judge and claims his file is destroyed ... So I can find no one who has proof of any set/ment or paperwork to reflect such an agreement .. Mr. Farmer claims the court records are destroyed (wow) ..."

Working with his office supervisor. Mr. Hardee checked Liberty Mutual's electronic file retrieval system to see if he could locate anything on the file in question. Nothing was found. Liberty Mutual's Cleveland office had assumed responsibility for Lexington's liability claims by this time, as Mr. Hardee subsequently ex-

plained in a deposition, so Hardee enlisted the help of Gilbert Bihn, the Director of Technical Claims in the Cleveland office. It was Mr. Bihn to whom, on October 28, 1998. Hardee sent the message summarizing what Mr. Farmer thought he remembered about the case.

Mr. Bihn and a Cleveland colleague, case manager Kenneth Muellauer, did "considerable checking." It was to no avail. No record was found in what was available for Cleveland, Louisville, or Lexington. Inquiry was made of an outside company that had arranged structured settlements for Liberty Mutual in the 1980s, but the outside company proved to have no relevant record. Neither did Liberty Life.

When Muellauer spoke with Farmer, as Muellauer later testified, Farmer told him that he "recalled the possibility of a structured settlement. . . ." Farmer thought an annuity was involved, but all he could remember about the amount, according to Muellauer, was that "it was for maybe a couple thousand dollars."

Farmer referred Muellauer to retired claims manager Paul Wilkins. Mr. Wilkins proved to have some memory of the underlying facts of the wrongful death case, but he drew a blank as to the ultimate disposition of the matter. (Mr. Wilkins explained at his deposition that he was handling between 1,000 and 1,500 cases a year during the 1980s.)

Muellauer testified that he made inquiry of personnel at Liberty Mutual's storage facility in Stoughton. Massachusetts, but "they couldn't locate anything with the information that I had available. . . ." In short, as Bihn told Hardee, the Cleveland office was able to find "[n]othing but dead ends."

Attorney Mehr's own notes indicate that he received a call from Don Hardee on November 11, 1998, at which time Hardee was "frustrated in trying to find the file because of its age." (At his deposition Hardee denied being "frustrated," but confirmed that "I couldn't find anything about it.")

On November 30, 1998, Mehr wrote Hardee a letter beginning with the somewhat puzzling assertion that "I still have not heard from you regarding the above case." (In point of fact, of course, Mehr had heard from Hardee less than three weeks earlier.) Mehr's letter continued as follows:

"We are being pressured into explaining to the Probate Court the disappearance or nonexistence of the annuity which Liberty Mutual was to supply. Please advise within ten days the results of your search."

The next day, December 1, 1998, Hardee faxed Mehr a response telling Mehr that his request had been referred to Gil Bihn in the Cleveland office. There the matter sat, apparently, until February of 1999, when Mr. Mehr filed the present lawsuit against Liberty Mutual on behalf of Mrs. King.

With the filing of the lawsuit, Mr. Hardee was evidently asked for comment by a man named Ken Norman in Liberty Mutual's home office compliance department. On April 8, 1999, Hardee faxed Norman a response that is worth quoting in full:

"ATTACHED ARE THE MATERIALS IN OUR POSSESSION . . . . .

"I FOUND AN ADDITIONAL NOTE WHICH MAY HELP . . . THIS WAS A MVA AND THE SUIT WAS IN LAUREL CIRCUIT COURT . . . THE COBBS {MOM AND CHILD} SURVIVED THE MVA. . . . MR. PAUL BRADEN WAS THE CLT ATTY, AND HE IS NOW A JUDGE IN EASTERN KY . . . HE ADVISED HE HAS NO RECORD OF THE CASE. MR. FARMER, WHO WAS

OUR ATTY., CLAIMS HIS FILE DE-STROYED BUT RECALLED THE CASE SETTLED FOR $5K {SPLIT $2500 EACH} ... HE THOUGHT THE CHILD SET MENT WAS AN ANNUITY TO BE PAID ONCE HE REACHED THE AGE OF MAJORITY {I ASSUME HE NOW IS THAT AGE AND WANTS HIS MONEY} ..

"PROBLEM IS NO ONE HAS A RECORD OF THE SET/MENT NOR ANNUITY AG/MENT THAT I COULD DETERMINE.... I HAVE A NOTE SHEIL COBB WAS THE MOTHER BUT NO NAME FOR THE CHILD ...

"LEXTON # WAS 513.... WE SEARCHED ACES, ETC AND FOUND NO RECORD OF CASE ...... IT WOULD SEEM THE CLTS OR THEIR ATTY WOULD HAVE A RECORD OF THE AG/MENT ..... ALSO SEEMED STRANGE THAT THE COURT WOULD NOT HAVE MAINTAINED RECORDS FOR THE SUIT ..

"I'M SORRY I CAN'T BE OF MORE ASSISTANCE."

Eleven days after the home office was advised of Mr. Farmer's recollection that Mrs. King's claim had been settled for $2.500, Liberty Mutual removed the present lawsuit from Lauren Circuit Court to federal court. On the same day—April 19, 1999—Liberty Mutual filed an offer to confess judgment in Mrs. King's favor for $2,500.

I digress from my chronology at this point to mention the majority opinion's suggestion that this was a "low ball" offer—a low ball offer which, in combination with equivocal deposition testimony subsequently given by Mr. Hardee after the lost file had been recovered from Stoughton and after Liberty Mutual had agreed to pay the full present value of what the

Stoughton records established as the correct dollar amount of the annuities, could somehow support "a reasonable inference that the purpose of the delay [in payment] was to extort a more favorable settlement...." Given what Liberty Mutual's people actually knew at the time the offer to confess judgment was made, I find myself at a loss to understand the basis for this suggestion.

In the first place, the reason for the delay in payment after Justin Cobb achieved his majority was perfectly obvious; the settlement had not been documented, and Liberty Mutual simply did not know how much Mrs. King had been promised—if, indeed, she herself had been promised anything in addition to the unknown amount promised Justin Cobb, who was not a party to the lawsuit.

In the second place, the trial lawyer who had conducted the settlement negotiations for Liberty Mutual a decade earlier, and whose files had long since been destroyed, had apparently told different Liberty Mutual personnel prior to the offer to confess judgment that "an annuity of some $1500 or $2500 was to be paid;" that an annuity "for maybe a couple thousand dollars" was involved; and that Mrs. King and Justin Cobb were each to be paid $2,500, with Justin's $2,500 to be paid once he reached the age of majority. (Liberty Mutual did not know, at this point, what attorney Braden's recollection was.) A payment of $2,500 was the most that Mr. Farmer remembered Mrs. King having been promised, and an offer to confess judgment in that amount, notwithstanding the absence of any written settlement agreement or other documentation of the figure, was hardly a "low ball" offer, in my opinion. Neither, in my view, can the offer reasonably support an inference that Liberty Mutual was purposely dragging its feet on

payment in order to "extort" an unfair settlement.

But let me return to the chronology. Mrs. King's deposition was taken on June 25, 1999, and Judge Braden's a couple of weeks later. Both witnesses testified that Mrs. King's wrongful death case had been settled with an agreement to provide annuities for Mrs. King and Justin Cobb, but the memories of the witnesses differed as to the dollar amount of the annuities. Neither witness could provide any documentation showing what the agreement had in fact been, and it turns out that both were wrong about when the annuity payments were to start.

On June 30, 1999, acting in response to a subpoena served on the records custodian of Mr. Farmer's law firm, Farmer executed a document in which he stated that the firm's file in *King v. Kentucky Stone Co.*—inaccurately described by Farmer as "a lawsuit that was tried in the mid–1980's"—had been destroyed several years earlier. Farmer's statement was filed with the court on July 1, 1999.

On July 26, 1999, Ms. Diane Rose, the lawyer defending Liberty Mutual in the present lawsuit, telephoned a former employee of the company's Lexington office, Tim Kellams, to see if he had any information relating to the claim. He did not, but he volunteered to search the "purged file" records. This led to discovery of two original claim file numbers for the wrongful death case.[3] The file numbers were promptly sent to Mr. Norman at the home office. Norman relayed them to the Cleveland office and requested that another attempt be made to locate the missing files. Cleveland again contacted Stoughton, and this time—armed with the correct file numbers—a file clerk at Stoughton was able to retrieve one of the pertinent claim files. (The other, it appears, had been destroyed pursuant to Liberty Mutual's records retention policy.) Ms. Rose received the recovered file on August 9, 1989.

Having read the file and learned that the total settlement amount discussed had been $15,000, with $5,000 for Mr. Braden and $5,000 to be spent on each of two annuities, Ms. Rose obtained authority to make a new settlement offer. On September 13, 1999, Ms. Rose advised attorney Mehr and attorney David O. Smith. who was representing Justin Cobb in a state court lawsuit against Liberty Mutual, that the decade-old file had been found. She told the lawyers what it showed as to the amounts that had been discussed, and, based on a present value of $9,511.81 for Mrs. King's annuity and $8.838.29 for Justin Cobb's, she offered $12,000 to resolve Mrs. King's claims and $11,000 to resolve Mr. Cobb's. A partial settlement was subsequently concluded that left only the bad faith claim to be adjudicated.

Meanwhile, on September 20, 1989, Liberty Mutual moved for an order joining Justin Cobb as a party plaintiff in the present action. The district court granted the motion.

On December 15 and 16, respectively, attorney Mehr took the depositions of Donald Hardee and Paul Wilkins. Wilkins—long retired after more than 40 years of service with Liberty Mutual was still very much in possession of his faculties, but he had no independent recollection of a settlement 11 years earlier. Mr. Hardee, of Liberty Mutual's Louisville office, had not been involved in the original settlement negotiations, of course, and was

---

**3.** The record indicates that the original file numbers would have been changed in the course of a subsequent reorganization.

only able to testify as to events subsequent to September 30, 1998. Hardee described the unsuccessful efforts he had made to locate a file for Mrs. King's wrongful death case and his communications with Mr. Farmer, a secretary in Judge Braden's office, and attorney Mehr himself. Perhaps the most noteworthy passage in Mr. Hardee's deposition is the account he gave of what he was told when he called Preston Farmer:

"A He told me that his records had been destroyed. He had a little information. He thought that our Lexington office had handled the case. What sticks out in my mind is something about the case being dismissed. But essentially he told me his records had been destroyed.

"Q Did he tell you the case had been settled before it was dismissed?

"A He mentioned something about a settlement, but whether it was before or after the case was dismissed, that I don't recall.

"Q Okay. What did he mention about the settlement?

"A He had no paperwork. He didn't have any records of it.

"Q All right. Did he remember that there was, in fact—that the wrongful death case had been settled?

"A No, I don't—

"Q Did he tell you that?

"A He didn't know for sure if it had. He thought the case may have been settled, but he had no paperwork because it had been destroyed.

"Q He thought it may have been settled, but he wasn't sure?

"A I'm going to have to let Mr. Farmer speak for himself in that regard.

"Q I'm—I guess I'm pushing your memory beyond what's there. Is that what you're—

"A Very limited.

"Q Okay. So he may have said definitely it was settled and he may have said it may have been settled. You don't remember which?

"A I don't recall him saying the case had been settled. He thought it may have been settled, as best I recall his words."

It would have been interesting to hear firsthand from Mr. Farmer. His deposition, however, was never taken.

On January 4 and January 5, 2000, finally, Mr. Mehr took the depositions of Kenneth Muellauer and Donna Leaman. I have already touched on the highlights of Mr. Muellauer's testimony, and I shall not repeat myself on that subject. Donna Leaman—who testified that she had graduated from law school in May of 1988 and passed the bar—explained that her role in Mrs. King's case had been to assist the branch office in doing a structured settlement. She further testified that she did not know why Mrs. King had not got the annuity contracts, but "[i]t doesn't appear that there was a firm settlement." She stated that she would have needed the last names of Joseph and Melisa. Mrs. King's beneficiaries, and these she thought she did not have. It is possible, Ms. Leaman added, that she would also have needed their address and social security numbers or dates of birth.

Ms. Leaman recalled having spoken with Paul Wilkins. She said she then called defense attorney Preston Farmer because, as she testified, "I was still missing key pieces of data." (Based on her memorandum of February 28, 1988, a jury would be entitled to find that Ms. Leaman's memory was playing tricks on her and that she had called Mr. Farmer well before her conversation with Mr. Wilkins on October 28, 1988, not afterwards.) Once she had all the details, she testified, she would have walked the papers to Liberty Life, and

that company would have issued the annuity contracts. She, Paul Wilkins, and the plaintiff's attorney would all have received copies—and we know they did not.

On February 8, 2000, Mrs. King and Liberty Mutual filed cross-motions for summary judgment on the bad faith claim. After further briefing, the district court granted Liberty Mutual's motion and denied Mrs. King's. Mrs. King then moved to alter or amend the judgment. The court granted this motion insofar as an award of costs was concerned, but, for reasons given in an extensive written opinion filed on May 4, 2001, the court denied the motion in all other respects. The case was dismissed with prejudice. Mrs. King has appealed, but Justin Cobb has not.

IV

Supporting its views with a multitude of references to the record, the district court expressed itself as follows in its memorandum opinion of May 4, 2001:

"Liberty Mutual's failure to pay the annuities after the settlement of the 1984 lawsuit and before Mehr's 1998 inquiry does not constitute bad faith. The recovered file demonstrates numerous communications among Liberty Mutual, Farmer, and Braden. All of those communications reflect Liberty Mutual's willingness to complete the settlement. Nothing in the record indicates that, during this time, Liberty Mutual acted with 'conscious wrongdoing or recklessness.'

*    *    *    *    *    *

"Furthermore, no evidence suggests conscious wrongdoing or recklessness by Liberty Mutual after King contacted the company in January 1998. At that time, she could provide only her personal recollection that she was entitled to an annuity. As the documents ... demonstrate, Liberty Mutual undertook an investigation of King's claim after

Mehr's inquiry. Hardee and Bihn communicated with each other twice during October 1998 about their inability to find any documents evidencing a settlement agreement. * * * The existence and amount of Liberty Mutual's obligation to pay King was not confirmed until August 1999, when Liberty Mutual discovered the remnants of a file reflecting settlement negotiations regarding two $5,000 annuities.

*    *    *    *    *    *

"The plaintiffs contend that evidence of Liberty Mutual's obligation was always discoverable within the company's own files. However, the record reflects, and the plaintiffs do not contradict, that between October 1998 and April 1999, Liberty Mutual diligently attempted to locate documents pertaining to King's claim. Hardee e-mailed Bihn asking him to 'try to resurrect some info re the case.' Bihn responded on October 29, 1998 that he and Ken Muellauer had 'done considerable checking.' Bihn contacted the companies which wrote annuities on Liberty Mutual's behalf during the 1980s but found that neither company had any record of the alleged settlement. Acting on Farmer's statement that a settlement may have been reached, Hardee contacted William Norman and asked for any available information. Liberty Mutual's inability to locate the file prior to August 1999 cannot be deemed an act of 'conscious wrongdoing or recklessness.' *Matt*, 798 F.Supp. at 434."

My colleagues on the panel take issue with the proposition that Liberty Mutual acted "diligently" in attempting to locate documents relating to Mrs. King's claim. Their point is well taken. I believe, in the sense that a jury could probably find that Liberty Mutual was negligent in failing to conduct an earlier search of the "purged file" records through which, we now know,

it was possible to obtain original file numbers for claim files in the closed Lexington office. We have no way of knowing whether Donald Hardee, or Gilbert Bihn, or Kenneth Muellauer was aware of the existence of these "purged file" records, but at least one former employee of the Lexington office—Tim Kellams—obviously was. It may well have been negligent not to consult Mr. Kellams earlier.

I am not aware of a shred of evidence, however, that the failure to consult Kellams earlier was deliberate or reckless. Neither am I aware of a shred of evidence that the failure to locate the Stoughton file on the first pass was deliberate or reckless. And I do not believe that Mr. Hardee's subsequent deposition testimony changes anything.

My colleagues have a feeling. I believe, that Mr. Hardee was less than candid at his deposition (a deposition given. I might point out, more than three months *after* Liberty Mutual had made a written settlement offer totaling $23,000) and a feeling that Hardee knew before Mrs. King filed the present lawsuit that the underlying claim had been settled on terms that included two annuities to be paid when Justin Cobb reached the age of majority. But in fact, as it turned out, neither of the annuities was to have been paid when Justin Cobb achieved his majority, and the most Mr. Hardee can reasonably be said to have known at the time Mrs. King filed suit was that Preston Farmer—who had no file at all—said that he recalled a case in which there had been a defendant's verdict; that the other claimants had elected to settle for a nominal amount; and that an annuity of some $1,500 or $2,500 was to be paid. (By April 19 of 1999, as we have seen, Mr. Farmer appears to have settled on the $2,500 figure.)

Whatever the shortcomings of Mr. Hardee's deposition testimony, it would certainly not be surprising for Mr. Hardee to

have been skeptical, before the Stoughton file was discovered, as to whether there had ever been a meeting of minds on a settlement. This court can take judicial notice, I think, of the paperwork that normally accompanies a final settlement in a case such as this. Where it becomes apparent, ten years after a settlement has supposedly been agreed to, that no release, no settlement entry, and no written settlement agreement can be found by the parties, the logical presumption for someone in Mr. Hardee's position would be that there had never been a final agreement on a settlement.

Be that as it may, I am satisfied that the record of this case simply does not show that there was a jury issue as to wilful misconduct or reckless disregard of Mrs. King's rights. This being so, I respectfully dissent.