## Prudential Ins. Co. of America v. Rains.

Jan. 30, 1940.

Tye & Siler for appellant.

Pope & Upton and L. O. Siler for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

On February 28, 1923, the Prudential Insurance Company of America issued to Ezra Rains a 37-year enlowment policy. The face amount of the policy was $5,000, and the annual premium was $124.70. The policy contained a total and permanent disability benefit provision by which the insured was to receive $10 per month for each $1,000 of the face amount of insurance in event of total and permanent disability before age 60. The payment of premiums was waived while such disability continued. The clause of the policy providing for the waiver of premiums reads:

"If the Insured shall furnish due proof to the Company that, while this Policy was in full force and effect, he (or she) at any time after payment of the first premium on the Policy, while less than sixty years of age, from any cause whatsoever had become permanently disabled or physically or mentally incapacitated to such an extent that he (or she) by reason of such disability or incapacity is rendered wholly and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value, the Company will waive the payment of any premium or premiums under the Policy the due date of which, as specified on the first page hereof, shall occur after the receipt of proof of such disability and while such disability continues."

On July 1, 1937, the insured, while lifting a case of coca cola, suffered a rupture described by his attending physician as an inguinal hernia. In December, 1937, he furnished the insurer proof of his disability on forms provided by the company, and made a claim for total and permanent disability benefits in the amount of $50 per month and for a waiver of future premiums on the policy. The company denied liability, and on August 26, 1938, Rains brought an action to recover the monthly payments alleged to have accrued after July 1, 1937, and $124.70, the amount of the annual premium, which he al-

leged he paid in March, 1938, after he had become total-
ly and permanently disabled. The company's defense
was that he was not totally and permanently disabled
within the meaning of the policy. Upon the trial of the
case, the jury returned a verdict in favor of the plaintiff
for $674.70, and the defendant has appealed.

It is first insisted that the evidence is not sufficient
to sustain the verdict. The plaintiff was 23 years of
age when the policy was issued. In the application he
stated that his occupations were farming and public
school teaching, and in his declarations to the medical
examiner he stated that he was a student in school and
had followed the occupation of teaching. He testified
that at the time he made the application for the policy
he was a student at Cumberland College in Williams-
burg, Kentucky, and had taught school during the two
preceding years. He worked on his father's farm in
Whitley county during the summer, and attended school
in Williamsburg during the winter months, endeavoring
to qualify himself for the teaching profession. On ac-
count of lack of funds, he was compelled to leave school
and, because of increased statutory requirements, did
not have the educational qualifications now required of
a teacher in the public schools. Thereafter, he worked
on the farm for several years, served as a deputy sheriff
four years, engaged in the grocery business about two
years, and, at the time his disability was incurred, was
operating a lunchroom and poolroom in Williamsburg.
As a result of an attack of infantile paralysis when he
was two years of age, his left leg was shorter and small-
er than his right leg, but this condition was known to
the insurer when the application for the policy was
made. He suffered an attack of eczema in 1937, and was
still suffering to some extent from that malady at the
time of the trial. After he suffered the hernia on July
1, 1937, he was highly nervous, suffered pain continual-
ly, and was unable to do any kind of work. A number
of physicians who treated him informed him that, on ac-
count of his condition and the nature of the hernia, an
operation was inadvisable, and would endanger his life.
Four physicians who had treated him testified, in sub-
stance, that he had a severe hernia, was highly nervous,
and was unable to perform any kind of manual labor;
that his condition was permanent, and, due to his condi-
tion and the nature of the hernia, an operation would be
dangerous. The location of the hernia was such that a
truss would afford little, if any, relief. There was also

medical proof to the effect that the atrophied condition of his left leg, resulting from the attack of infantile paralysis when he was a small child, was extending upward and growing progressively worse.

Four physicians examined him at the instance of the appellant. Dr. Henry Clay Long was asked what he found upon examination of Ezra Rains with reference to his physical condition, and answered:

"Patient walked into the office with cane. That comes under general appearance, Pyorrhea of Alveus, left inguinal hernia, atrophy of left muscles, left thigh and leg, shortening of left leg, exaggeration of the left lateral arch, Eczema, small area on dorsum of left foot and posterior surface of left leg middle lower third, small area on abdomen, shoulders and back, and genital organs. Diagnosis, Inguinal Hernia."

He stated that, in his opinion, an operation could be performed upon Rains without endangering his life, and, if successful, the disability resulting from the inguinal hernia would be removed. Dr. F. S. Smith was asked to state whether or not in his opinion Ezra Rains was totally or permanently disabled from following, in a substantial way, all of the material acts of his occupation of farming and school teaching, and from following the duties of a student, and he answered:

"So far as farming is concerned, in his present condition he would be able to do very little as a farmer; as a teacher or a student, so far as the hernia is concerned, he would be able to go about that."

In answer to another question of the same nature, he said:

"Well, in occupations of that kind if there is something that he could sit at a desk and wouldn't have to be on his feet too much, he could follow that successfully. * * * All except the ones that would require him to be on his feet considerably or to lift any strenuous work. Anything that he could sit around and not have to be on his feet a considerable part of the time."

Dr. H. L. Walden testified that on account of the location of the hernia it would be impossible for Rains to obtain much relief by the use of a truss. Dr. L. X. Brown testified as follows:

"Q. From your examination of Ezra Rains, would you say or not say, he is entirely disabled from following the duties of common school teacher, or the duties of a student? A. No, I would not say he was entirely disabled.

"Q. So far as you can tell from your examination he could follow the duties of a common school teacher. A. He could with little repair and support for his rupture there.

"Q. Is the rupture that he has of such nature and kind it could be repaired by operation or otherwise? A. Well, most cases are repairable.

"Q. Could such an operation be performed without any undue risk to his health and life? A. Well, it all depends on the kind of an operation, usually this kind of an operation matters very little.

"Q. Is there anything wrong with this man's heart, his general condition that would prevent him from successfully undergoing such an operation? A. No, I did not find anything that would prevent him from having an operation.

"Q. Do you know of any reason why this man could not perform the duties of office clerk, or engage in the occupation as manager of poolroom, and other character of work of that kind where no heavy lifting was required. A. No I don't know why he couldn't do that kind of work, I don't know whether he could stand up long hours and do work."

All of the physicians introduced as witnesses by appellant admitted that appellee is unable to perform any manual labor. Appellant argues that appellee's occupational risk at the time the policy was issued on February 28, 1923, was that of a student and teacher exclusively, and that these occupations are the only ones to be considered in determining whether or not the insured was disabled later within the meaning of the policy. We do not understand that insurance policies of this kind are so limited in their coverage. It is necessarily contemplated that the insured may change his occupation, and the insurance contract usually exempts the insurer from liability if the insured engages in certain hazardous occupations. Certainly, it was not contemplated by the parties to the contract of insurance in the present case that the insured would continue to be a

student during the life of the policy. Aside from this, however, the policy issued to appellee contains this provision:

"This Policy contains no restrictions as to residence, travel and occupation, except such as may have been endorsed on or attached to the Policy at the time of its issue and except as provided in the clauses referring to Accidental Death Benefit and Total and Permanent Disability Benefits, and it is incontestable after one year from its date, except for non-payment of premium, but if the age of the Insured be misstated the amount or amounts payable under this Policy shall be such as the premium would have purchased at the correct age."

The total and permanent disability benefit clause contains no restriction as to occupation. We think the evidence tended to show that the insured was totally and permanently disabled within the meaning of the policy. At least, the evidence on this issue was sufficient to take the case to the jury and to sustain its verdict. Rains testified that he was unable to do any kind of work, and his physicians said he was unable to work and that any kind of manual labor would be dangerous to his health and life. The physicians for the insurer admitted that he could do only light work. The only logical inference from their testimony is that he was unable to perform all material acts in the discharge of the usual and customary duties connected with his occupation, and that is the test of total disability under insurance contracts of the character here involved. Travelers' Insurance Company v. Turner, 239 Ky. 191, 39 S. W. (2d) 216; National Life & Accident Insurance Company v. Bradley, 245 Ky. 311, 53 S. W. (2d) 701. In John Hancock Mutual Life Insurance Company v. Cave, 240 Ky. 56, 40 S. W. (2d) 1004, 1005, 79 A. L. R. 848, it was said:

"Such a contract does not refer to a condition of utter helplessness, but must have been intended to cover such physical impairment as disabled the insured from performing all material acts in the discharge of the usual and customary duties connected with his occupation or employment."

In instruction No. 2 the court told the jury that if they found for the plaintiff under instruction No. 1 to find for him at the rate of $50 a month from December 1, 1937, the date when he filed his proof of alleged in-

jury and disability with the company, not to exceed the sum of $550. It is argued that this instruction is erroneous since the policy provides that total and permanent disability payments shall not begin until three months after the company has received proof of the existence of such disability, and that the recovery, if any, should be for eight months instead of eleven months. The policy does contain the provision relied upon by appellant, but on the margin is this printed endorsement:

"The payment of disability installments shall begin immediately after the company shall have received due proof of disability instead of being deferred for the period specified in these disability provisions."

Instruction No. 3 authorized the jury if they found for the plaintiff under instruction No. 1 to award him the further sum of $124.70, same representing the amount of the last annual premium paid upon the policy after the plaintiff had filed his proof of disability. The proof shows that a dividend of $20.70 was due on the policy, and the insured applied this on the premium and sent the company a check for $104. It is argued that the plaintiff recovered $20.70 more than he was entitled to, but in this contention the appellant is in error. The plaintiff was entitled to the dividend of $20.70, and, when it was applied on the premium, it was a payment to the company of that amount.

The judgment is affirmed.