**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0567n.06
Filed: August 9, 2007

**No. 06-6489**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

RICHARD W. PHELPS, D.D.S.,   )
              )
 Plaintiff-Appellant,    )
              )
v.             ) ON APPEAL FROM THE UNITED
              ) STATES DISTRICT COURT FOR THE
UNUM PROVIDENT CORP. AND UNUM ) WESTERN DISTRICT OF KENTUCKY
LIFE INSURANCE CO. OF AMERICA, )
              )
 Defendant-Appellee.   )

Before:  GIBBONS and SUTTON, Circuit Judges; BECKWITH, District Judge.[*]

SUTTON, Circuit Judge.  Richard Phelps contends that the district court erred in granting summary judgment to his insurer on his bad-faith, denial-of-coverage claim and in awarding prejudgment interest on his successful contract claim at the rate of 8% (rather than 12%) per annum. We affirm.

I.

After graduating from dental school in 1977 at the age of 32, Richard Phelps purchased an individual "own occupation" disability policy from an insurance company now known as Unum Life

---

[*] The Honorable Sandra S. Beckwith, Chief Judge, United States District Court for the Southern District of Ohio, sitting by designation.

Insurance Co. of America, a subsidiary of Unum Provident Corp (collectively, Unum). The policy provided $1,000 per month in the event he suffered a "total disability," JA 49, which the policy defined as being unable "to perform the duties of his regular occupation." JA 57.

As a solo practitioner, Phelps offered comprehensive dental care and referred patients to specialists for certain procedures. He operated his office independently, did not employ a hygienist or other technical staff and worked four days per week.

In 1999, Phelps was diagnosed with osteoarthritis in both of his thumbs. He underwent his first surgery—an arthroplasty on his right thumb—in December 1999. Phelps submitted a total-disability claim in March 2000, and one month later he began receiving monthly benefits from Unum.

In October 2000, Phelps hired an independent contractor, Dr. Herrick, to perform dental work on a part-time basis. Despite the first surgery and at least one course of physical therapy, Phelps continued to experience symptoms of pain, swelling and stiffness, and he underwent a second surgery in April 2001. He returned to the office on a part-time basis later that year.

In March 2002, after two years of paying benefits, Unum notified Phelps that it would make future disability payments under a reservation of rights. In a personal interview with the insurance company that month, Phelps reported that he typically saw four patients two days per week. Dr. Herrick, he added, worked three and a half days per week and saw patients that Phelps could not treat due to his disability. Phelps' hand surgeon noted in June that Phelps was "unable to sustain [a] pinch

grip and work full time dentistry." JA 99.

By August 2002, Phelps worked three and a half days per week. He performed administrative duties and clinical work such as dental cleanings, fillings and extractions, as well diagnostic work such as examining teeth, reading x-rays and recommending treatment plans. In September, Unum terminated the monthly benefits, reasoning that because Phelps had returned to dentistry work after his surgeries, he was only "partially disabled" and therefore failed to qualify for "total disability" benefits. JA 113, 395. After some unsuccessful attempts to sell his business, Phelps closed his practice on March 1, 2005.

Phelps filed claims against Unum in state court for breach of contract and for bad faith failure to honor the insurance contract, seeking compensatory damages, punitive damages, prejudgment interest and attorney's fees. Unum removed the case to federal court on diversity grounds.

Both sides moved for partial summary judgment—Unum on the bad-faith claims and Phelps on the contract claim and the first two elements of his bad-faith claims. The district court granted Phelps' motion on the contract claim, reasoning that "total disability" under the contract includes an insured's inability "to perform at least one . . . essential dut[y] of his regular occupation." D. Ct. Op. at 8. The court ordered Unum to pay Phelps past benefits plus prejudgment interest at the rate of 8%. The district court granted Unum's motion on the bad-faith claims, concluding that the insurance company had a reasonable legal basis (even if an erroneous one) for denying Phelps's claim of "total disability."

II.

On appeal, Phelps challenges the district court's summary-judgment decision in favor of

Unum on the bad-faith claims as well as its decision to award him 8% rather than 12% prejudgment

under Kentucky law. *See* Ky. Rev. Stat. Ann. § 304.12-235. Unum does not appeal the court's

judgment for Phelps on the contract claim. We give fresh review to a summary-judgment decision,

*Alpert v. United States*, 481 F.3d 404, 407 (6th Cir. 2007), and will affirm a grant of summary

judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to

a judgment as a matter of law," Fed. R. Civ. P. 56(c); *Alpert*, 481 F.3d at 407.

A.

Kentucky applies a "single test" for measuring "the merits of bad-faith claims, whether

brought . . . under common law or statute." *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 527

(6th Cir. 2006). The test requires an insured to show three things to prevail: (1) that the policy terms

obligate the insurer to pay the claim; (2) that the insurer's denial lacks a reasonable basis in law or

fact; and (3) that the insurer knowingly or recklessly acted without a reasonable basis for denying

the claim. *See id.* at 527; *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993).

At this stage in the litigation, Unum concedes that the total-disability policy covers Phelps'

claim. The salient question is whether Phelps can satisfy the second element of the test—whether

he can show that Unum lacked a reasonable basis in law or fact for denying his claim. To prevail

on this point, the insurer need not show that its interpretation of the policy language was the best

interpretation, only that it was a reasonable one. *See Rawe*, 462 F.3d at 527. The insured's claim to benefits need be only "fairly debatable as to either the law or the facts." *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.*, 880 S.W.2d 886, 890 (Ky. Ct. App. 1994); *see also Bluegrass Marine, Inc. v. Zurich Am. Ins. Co.*, 87 F. App'x 493, 498 (6th Cir. Dec. 23, 2003); *Cowan v. Paul Revere Life Ins. Co.*, 30 F. App'x 384, 388 (6th Cir. Feb. 11, 2002). "If a genuine dispute does exist as to the status of the law governing the coverage question, the insured's claim is fairly debatable and the tort claim for bad faith based upon the insurer's refusal to pay the claim may not be maintained." *Empire Fire*, 880 S.W.2d at 890.

The meaning of "total disability" was "fairly debatable" when Phelps filed this claim. The policy's definition of "total disability," as an initial matter, was not a model of clarity. To establish eligibility for benefits, the policy required the insured to show that he could not "perform the duties of his regular occupation." JA 57. This definition raises more questions than it answers: Does it require the insured to show he cannot perform every material duty of his job? Most duties of his job? Just some duties of his job? Unum paid benefits under the policy for the first two years, but it viewed Phelps' eventual capacity to return to work three and a half days a week (he had worked four days a week before his injury) and to perform many functions of a dentist as disqualifying. That was not an unreasonable interpretation of this definition because, when the company denied coverage, Phelps could perform many "duties of his regular occupation."

The context in which Phelps obtained this policy also gave the insurance company a reasonable basis for denying coverage. At the time Phelps purchased this policy, Unum offered a

"residual disability" rider. It defined "residual disability" to mean the "inability of the Insured to perform one or more but not all of the material and substantial duties of his regular occupation" or "loss by the Insured of at least 25% of the time usually required for the performance of the material and substantial daily duties of his regular occupation." JA 137. The existence of this additional coverage option—defining eligibility based on an inability to perform "one or more" material duties or based on an inability to work a certain amount of time—and Phelps' decision not to purchase this rider also support the reasonableness of Unum's position that "total disability" required an insured to show something more than an inability to perform certain material duties of a dentist.

Case law also supports the existence of "a genuine dispute" over the meaning of this policy. *Empire Fire*, 880 S.W.2d at 890. The most pertinent Sixth Circuit case is *Ginsburg v. Insurance Co. of North America*, 427 F.2d 1318 (6th Cir. 1970), which arose under Kentucky law. Construing a policy that defined "total disability" as "the Insured's complete inability . . . to perform every duty of his occupation," *Ginsburg* held that the inability of the insured, a nurse anesthetist, to perform "at least one essential task" (intubating patients) satisfied the definition. *Id.* at 1320. While Phelps relies heavily on *Ginsburg* and while the court's favorable construction offers some support for his argument, the fact remains that the *Ginsburg* policy and the Unum policy define "total disability" differently.

Kentucky cases, moreover, generally have not followed the "one essential task" approach of *Ginsburg*—both before our court decided *Ginsburg* (without, incidentally, citing any Kentucky case law) and after that decision. While the cases tend to involve different policy definitions of "total

disability" and thus make it difficult to generalize across cases, Kentucky courts have historically considered the insured's ability to perform material acts in the usual and customary duties of his occupation, looking to the quantitative and qualitative effects of the disability on the insured's performance. *See, e.g.*, *Prudential Ins. Co. of Am. v. Rains*, 136 S.W.2d 792, 795 (Ky. 1940) (holding that under Kentucky case law, total disability—defined in the policy as being so incapacitated as to be "rendered wholly and permanently unable to engage in any occupation or perform any work"—means whether an insured is "unable to perform all material acts in the discharge of the usual and customary duties connected with his occupation"); *John Hancock Mut. Life Ins. Co. v. Cave*, 40 S.W.2d 1004, 1005 (Ky. 1931) (holding that total disability—defined in the policy as being "continuously prevented . . . from performing any and every duty pertaining to [one's] occupation"—means the inability to "transact[] all kinds of business or work pertaining to his occupation or employment" and looking to whether there is "such physical impairment as disabled the insured from performing all material acts in the discharge of the usual and customary duties connected with his occupation or employment"); *Travelers' Ins. Co. v. Turner*, 39 S.W.2d 216, 217 (Ky. 1931) (holding that total disability—defined in the contract as "wholly disabled by bodily injuries or disease" such that one "will be permanently, continuously and wholly prevented thereby for life from engaging in any occupation or employment for wage or profits"—should be analyzed from the "two angles" of "quantity and quality" to determine whether one is unable "to do substantially or practically all material acts in the transaction of the insured's business in his customary and usual manner"); *see also* Ky. L. of Damages § 27:12 (explaining that total disability generally "means unable to do those things customarily done"); *cf. Murphy v. Lumbermens Mut. Cas.*

*Co.*, 580 S.W.2d 502, 504 (Ky. Ct. App. 1979) (holding that an orthopedic surgeon who could no longer perform surgery and who was "unable to continue even a limited practice" was entitled to benefits under a policy providing coverage when an insured is "wholly and continuously" unable to perform "all the duties of his profession").

In view of the tension between *Ginsburg*'s "one essential task" approach and the quantitative and qualitative approaches of the state court cases applying Kentucky law, in view of the fact that none of these cases involved the same policy definition of "total disability" as Unum's policy and in view of the definition of "total disability" in *this* policy, it was not unreasonable for Unum to take the position that total disability must account for changes in the quality and quantity of the insured's duties. Total disability under the policy, in contrast to residual disability under a separate policy option, required Phelps to show that he could not "perform *the duties* of his regular occupation." JA 57 (emphasis added). Inability to perform "the duties" of the job could be construed to mean an inability to perform just one material duty, several material duties or all material duties. Faced with this ambiguity and faced with the existence of a policy option that covered partial or "residual" disability, Unum did not act unreasonably in pulling the plug on coverage when Phelps returned to working three and one-half days a week, a mere one-half day less than he worked before the onset of osteoarthritis. That the insurance company initially paid coverage under the policy for the first two years after Phelps' injury and denied coverage only after he returned to work for nearly the same number of hours he had worked before his injury bolsters this conclusion.

Phelps argues that a "fairly debatable" claim under Kentucky law requires something more—namely, a legal question of first impression. *See Empire Fire*, 880 S.W.2d at 891 (holding that a claim involving a legal question of first impression was fairly debatable). While Kentucky law makes an issue of first impression a sufficient condition for establishing a "fairly debatable" claim, it does not make it a necessary one, and it accordingly does not rule out the possibility that competing strands of the law (as here) and difficult questions of fact (as here) will make the claim a fairly debatable one. What is more, this argument fails even on its own terms. Phelps never points to a Kentucky case involving the same definition of "total disability" as this one and never explains why this definition indeed did not present a question of first impression.

Phelps next points out that the early Kentucky cases interpreting "total disability" involve "any occupation" disability policies, as opposed to the occupation-specific policy at issue here. But as the highest court of Kentucky has noted, Kentucky courts have not always distinguished between policies in terms of "occupational" type. *See Cont'l Cas. Co. v. Johnson*, 234 S.W.2d 190, 191 (Ky. 1950) ("For some time this court made no distinction in construing . . . the 'occupational type.' It was held that the insured was entitled to the disability benefits of his policy if he showed physical inability to follow his usual occupation."). These cases remain the best Kentucky-law guidance on the issue, and they discuss the policies in terms of the individual's specific occupation just as occupation-specific policies require us to do today. *See Travelers' Ins.*, 39 S.W.2d at 217; *John Hancock Mut.*, 40 S.W. 2d at 1005.

Phelps next suggests that a ruling for Unum on the bad-faith claim would be irreconcilable with the district court's (unappealed) grant of summary judgment to Phelps on the contract claim. Not so. As a matter of logic, the two claims are distinct: One asks what the policy means; the other asks what it "reasonably" could be construed to mean. As a matter of precedent, we have found at least twice before—on summary judgment—that an insurer is not liable for bad faith under Kentucky law even when it owes the insured benefits under the contract. *See Bluegrass Marine*, 87 F. App'x at 498 (applying Kentucky law); *Cowan*, 30 F. App'x at 387–88 (applying Kentucky law). To survive a bad-faith claim on summary judgment, "[a]n insurer's position must only be 'fairly debatable'[;] it need not be correct as a matter of law." *Id.* at 388.

Phelps next contends that the district court failed to address two of his claims. *See* Ky. Rev. Stat. Ann. § 367.170 (prohibiting unfair acts "in the conduct of any trade"); *id.* § 304.12-010 (prohibiting unfair acts in the business of insurance). But both of these claims are statutory bad-faith claims, and Kentucky law provides a "single test . . . for the merits of bad-faith claims, whether . . . brought under common law or statute." *Rawe*, 462 F.3d at 527.

B.

State law governs an award of prejudgment interest in a diversity case. *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). Under Kentucky law, "[t]he determination as to whether or not to award prejudgment interest" is an equitable decision of the trial court that we review only for abuse of discretion. *See Church & Mullins Corp. v. Bethlehem Minerals Co.*, 887

S.W.2d 321, 325 (Ky. 1992). Generally speaking, the interest rate should not exceed the legal rate of 8% per annum unless authorized by statute. *See* Ky. Rev. Stat. Ann. § 360.010(1); *Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001). One statute providing a higher rate is § 304.12-235, which says that 12% "shall" apply "[i]f an insurer fails to make a good faith attempt to settle a claim" within 30 days of notice and proof of claim. Ky. Rev. Stat. Ann. § 304.12-235.

In arguing that the 12% rate should apply, Phelps faces a problem similar to the one that defeats his bad-faith claim. A district court does not abuse its discretion in failing to apply a statute that requires a lack of *good* faith when we have already held that there is a lack of *bad* faith as a matter of law. The only evidence that Phelps presents regarding Unum's offer to settle the claim is that the company expressed its willingness "to consider [granting] benefits based upon the percentage of loss your practice has realized when compared to your income prior to disability." JA 205. In light of our decision that Unum's denial of benefits was not in bad faith, we cannot hold that Unum's offer to pay out some of the benefits was not in good faith. As we have made clear in affirming the district court's grant of summary judgment for Unum on the bad-faith claims, liability in this case was fairly debatable. *Cf. Coomer v. Phelps*, 172 S.W.3d 389, 395 (Ky. 2005) (interpreting a similar good-faith provision to require "an insurer [to] make a good faith attempt to settle any claim[] for which liability is beyond dispute").

III.

For these reasons, we affirm.