## Louisville & Nashville Railroad Company v. Lee.

### (Decided June 3, 1913.)

### Appeal from Ohio Circuit Court.

1. Contracts—Avoidance for Fraud—Settlement Between Injured Servant and Master—When May Be Avoided.—A servant who settles a claim against the master growing out of personal injuries may avoid the settlement if he can show that fraud was practiced in its procurement or that he did not have sufficient mental capacity to understand the nature or effect of the contract.

2. Evidence—Statements of Unauthorized Persons to Induce Injured Servant to Settle Claim Not Competent.—Where an injured servant was approached by persons not authorized to settle his claim, statements made to him by them are not competent in an action by the servant to recover damages from the master.

GLENN & SIMMERMAN and CHARLES H. MOORMAN for appellant.

HEAVRIN & WOODWARD and BEN D. RINGO for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee, Wayne Lee, while working for the appellant company, on July 9, 1910, as a section hand, was injured by being thrown from a hand-car on which he was riding, as the result of a collision with another hand-car. In January 1911, he was again injured, as he alleged, by the negligence of the company in the operation of its trains.

To recover damages for these injuries, he brought suit, and on a trial before a jury a verdict was returned assessing the damages in his favor on account of the injuries received in July at $6,500, the jury finding in favor of the defendant on account of the January accident. On this appeal a number of reasons are assigned by the company why the judgment entered on the verdict should be set aside and a new trial granted, and we may here remark that as the appellee does not complain of the find-

ing against him on account of the January accident, the facts relating to it need not be noticed.

In its answer the company, after denying that the injuries received by appellee in July resulted from any negligence on its part, pleaded in bar of the action a settlement made with appellee on September 23, 1910.

In a reply the appellee averred that when he signed the paper pleaded as a settlement, he was in such mental and physical condition on account of the injuries received by him in the July accident that he did not know the nature or quality of his acts or understand or appreciate the meaning or effect of the paper that he signed, and further averred that his signature was procured by fraud, overreaching and misrepresentation on the part of the agent of the company.

In view of the conclusion we have reached as to the disposition of the case, it does not seem necessary to go into details concerning the nature of the accident or the extent of the injuries received by appellee. We may however, say in passing that there was sufficient evidence to warrant the jury in finding that the July accident was the result of negligence on the part of employees of the company superior in authority to appellee, and that the assessment in favor of appellee was not excessive considering the nature and extent of the injuries he received. With this matter out of the way, we will come at once to consider the effect of the settlement made with appellee and the circumstances surrounding the transaction, taking up afterwards other matters that are relied on by the appellant as grounds for reversal.

Putting the evidence of appellee in narrative form, he said that Perdue, a section foreman for appellant, Hammond, one of its track supervisors, Shaft, a claim agent and Starks, road master, came to see him at different times after he was injured and talked to him with reference to making a settlement with the company. He said he saw Mr. Starks the first time at Elmitch, several weeks after he was injured, and when he was able to go about, and that the following conversation took place between himself and Starks:

"He told me he had a letter from Mr. Logsden and was authorized to see me and see what I wanted, and I told him I didn't know how well I was getting along and I didn't know how serious I was hurt, and he said he would be glad to know what I wanted for a settlement, and I asked him then what he thought I was entitled to,

and he said he didn't know, that he had been authorized by Mr. Logsden to make me an offer and he had to be governed by that, and I asked him how much, and he said $150, and I told him I didn't think that was enough and he says, "We want to give you employment so you can go right to work," and I said 'Well, that would be different,' and I asked about the employment and he said he had different kinds, and I said, 'What kind of a job do you have for me?' and he said, ' Mr. Logsden and I have talked about putting you on as lamp inspector,' and I said, 'What kind of a job is that?' and he said, 'To go over the division and inspect the switch lamps,' and I said, 'That would be running about all the time, won't it?' and he said, 'Yes, but I think that is what you need, is exercise and open air,' and I said, 'I don't think so; I think I need something like a stationary job,' and he said, 'This is all we have,' and I told him, I said, 'I don't know anything about it; possibly it would suit me if I understood it,' and he said, 'We mean to instruct you what to do,' and I asked him what this would pay, and he said, '$1.60 a day,' and I said, 'Suppose I can't hold this job,' and he said, 'You won't know until you try,' and I said, 'If I try and fail, then what?' He said, 'We mean to give you something you can hold,' and I said, 'I don't know; possibly this will be the best thing I could do.' "

He further said that in this conversation Starks told him that he would send him a pass to come to Madisonville when he got ready, and that he replied that he would study the matter over and that on September 23d, he went to Madisonville and met Starks, when the following conversation took place:

"He said that he couldn't give me more than $150, that he would give me this job and would settle with me, and I told him in case I wasn't able to do this work, then what? and he says, 'We will give you something; we mean to settle with you,' and informed me that the L. & N. Company was looking for good young men of good intelligence, and he had taken me to be one—I had proven to be at that time, and he believed I would get over this wreck, and in case I didn't he would give me a job I could see to and I told him I had been informed that I ought to have a writing to show I had a lifetime job, and he said, 'They will give you a lifetime job only this way, and I will guarantee you a job as long as you will do the thing right.' He says, 'It is the next thing, only we don't give

you any writing, and all I ask you to do is to sign a receipt for this $150, and this is merely up to now, and we will settle the rest afterwards.' "

He further said that as a result of this conversation he signed the following receipt: "Received of the Louisville & Nashville Railroad Company one hundred and fifty 00-100 dollars ($150.00) in full compromise, settlement, and adjustment of all claims and demands on account of injuries to the person, including those that may hereafter develop as well as those now apparent, and damage to and loss of property, sustained by me, at or near Sunnydale, Ky., on the 9th day of July, 1910, while a section laborer on said company's railroad, and on every other account whatsoever.

"In making this settlement, no promise has been made to me of future employment, and the amount paid me in this voucher is paid in settlement of my claim as aforesaid, and not as lost time, wages, or otherwise than as aforesaid. And it is distinctly understood and agreed by me that the sole and only consideration inducing me to execute this release is the payment to me of the sum of money mentioned above.

"Before executing this release I have fully informed myself of its contents and I execute it with full knowledge thereof, and of my own free will and accord."

Asked, "Did you know at that time, or did he tell you that that receipt was in full settlement of all the injuries you had received before that time?" he replied, "I did not." "Q. Tell the jury what your general condition was then in September after your injury in July? A. It was very poor. I was nothing but a nervous wreck at that time. Q. Was a receipt ever read to you? A. I think not. Q. Did you ever read it? A. I don't remember that I did; I don't think I did. Q. I believe you did sign some sort of receipt for that $150? A. Yes sir. Q. Do you remember when you signed a receipt that day? Do you think you signed some paper that day? A. I think I signed some paper that day. Q. Did you know that the paper you signed contained any such statement as has been read out of this paper? A. No sir; I did not. Q. What did induce you to sign this paper that Mr. Starks presented to you? A. I signed it as a mere receipt. Q. What induced you to sign it? Did you, or not, rely on what the man Starks said to you? A. Yes sir. Q. Did you believe what he had said about this was true? A. I believe he would stay with me. Q. Did you believe what he said about it

was true? A . Yes sir. Q. Did you read this receipt, or not? A. I don't know as I read that one. As I stated, I read something as a receipt, a mere receipt. Q. Did you read all of it? A.  I don't know that I read all of it.  Q. Was it ever read to you? A. No sir; I don't think it ever was.''

Dr. Duff, the physician who attended appellee, was asked: ''Was he, or not, competent at that time, September 23, 1910, by reason of his physical and mental condition, such as you have described, to attend to business and know and understand the effect of his acts and appreciate their effect? A. I don't think he was.''

Without relating more of the evidence upon this point, it appears that on different occasions after appellee was injured Starks and other employees of the railroad company discussed with appellee the subject of making a settlement, and that the settlement made on September 23d was practically the same as the proposition that Starks had made as the basis of a settlement in the conversation with appellee some days before at Elmitch. It is very evident that the matter of making a settlement had been under consideration by appellee for some weeks or days before the settlement was actually made, and also that in the conversations he had with Starks no misrepresentations were made to him by Starks, nor was he decieved by anything that Starks said. It is also shown that appellee was paid the $150 at Madisonville, and that he at once went to work as a lamp tender and continued in this employment until he was injured in January, 1911. It also appears that appelle had little education and no business experience.

There is some evidence that he believed he was signing a receipt for $150, and that he did not know that the paper he signed was a settlement of any claim he might assert for damages, and there is some evidence that his mental condition was such that he could not understand or appreciate the effect of his acts. The evidence as to appellee's ignorance of the contents of the paper he signed, and as to his want of capacity to understand and appreciate it, is not at all satisfactory, but we think it was sufficient to take the case to the jury upon this issue, but there was no evidence to take the case to the jury upon the issue made by the pleadings that he was induced to sign the paper by fraud or misrepresentation.

The court, however, instructed the jury that if they believed from the evidence ''that the plaintiff was not,

at the time the writing referred to was executed by him, mentally competent to understand the nature and effect of such contract, or if you believe that the agents and servants of the defendant fraudulently misrepresented to the plaintiff the terms and conditions of the said contract of settlement, and fraudulently represented to the plaintiff that the writing referred to was merely a receipt for the sum of $150, and that it would not preclude him from collecting by suit or otherwise for such injuries as might prove to be permanent, and that the settlement was not final and was not meant to cover any future or permanent injuries, and that by reason of such fraudulent misrepresentations, if any made, by the agents and servants of the defendant, the plaintiff was induced to and did sign the written contract of settlement, relying upon the representations aforesaid." * * * *

In our opinion the court committed error in submitting any instruction upon the subject of fraudulent misrepresenation, or misrepresentations of any kind, made to appellee. The jury should only have been instructed on the subject of appellee's lack of mental capacity to understand the nature and effect of the paper he signed, and upon this point should have been told in substance that if in the paper signed by appellee, he agreed to accept $150 in full settlement of all claims for damages arising out of the injuries he sustained in July, 1910, they should find for the defendant, unless they believed from the evidence that when appelle signed this paper he did not have mental capacity sufficient to understand its nature and effect and believed that he was signing a receipt for $150 and not a settlement of any claim he might have for damages.

In reference to the admission of evidence, it was error to permit appellee to relate anything that any of the employes of the railroad company said in reference to a settlement except Starks and Shaft, or some one acting for them, or one of them. Starks, the Superintendent, and Shaft, the Claim Agent, had authority to make settlements, but it does not appear that the other persons did, and what they said to appellee was not competent for any purpose.

It was further error to submit to Dr. Duff the question in the form it was put as to the physical and mental condition of appellee at the time the settlement was made. Dr. Duff was not competent to testify on this subject unless he first qualified himself as an expert by saying that

he knew what the mental condition of appellee was when the settlement was made, and if he so qualified himself, the inqury should have been limited to the competency of appellee to know and understand the nature, extent and effect of the contract he entered into.

It was further error for the court to permit appellee to make any statement concerning his financial condition, and the conduct of counsel in asking Arbuckle, who was injured at the same time appellee was, if efforts had been made to settle with him, and what he received in settlement, was highly prejudicial. It is true the court promptly sustained objections to these questions, but neverheless the questions were manifestly improper, and we have so ruled in several cases. L. & N. R. R. Co. v. Reaume, 128 Ky., 90.

For the reasons indicated, the judgment is reversed, with directions for a new trial in conformity with this opinion.