Margaret COOMER, Appellant,

v.

Charlie PHELPS;  and Progressive Northwestern Insurance Company, Appellees.

No.  2004–SC–0294–DG.

Supreme Court of Kentucky.

Sept. 22, 2005.

Bridget Leigh Dunaway, Taylor, Keller & Dunaway, Amanda Lester Hill, Taylor, Keller, Dunaway & Tooms, London, KY, Counsel for Appellant.

John W. Walters, Timothy Culver Feld, Lexington, KY, Counsel for Appellee, Charlie Phelps.

Donald L. Miller, II, Diane Rose Conley, Frost, Brown & Todd, Louisville, Kristi Mildred Smith, Frost, Brown & Todd, Lexington, KY, Counsel for Appellee, Progressive Northwestern Insurance Company.

Opinion of the Court by Justice ROACH.

## I. INTRODUCTION

This case arises on appeal from the Pulaski Circuit Court which granted summary judgment in favor of the Appellees, Charlie Phelps and Progressive Northwestern Insurance Company ("Progressive"), Phelps's insurer. The Circuit Court's decision, which was affirmed by the Court of Appeals, relied exclusively on a release that the Appellant, Margaret Coomer, executed in favor of Mr. Phelps and his insurer. Coomer challenges the validity of this release, and likewise the summary judgment, on three independent grounds: (1) that the doctrine of mutual mistake should apply to invalidate the release; (2) that the release is invalid as a result of constructive fraud; and (3) that Coomer did not have sufficient capacity to execute such a release. Coomer also claims that she is entitled to damages as a result of Progressive's bad faith, as allowed by Kentucky's Unfair Claims Settlement Practices Act. Having found no adequate grounds to support invalidating the release or to support her claim of bad faith, we affirm the Court of Appeals.

## II. BACKGROUND

The facts underlying this case are largely undisputed by either party. On the evening of July 25, 2001, after accompanying Phelps to dinner, Coomer was injured when her left knee was struck by Phelps's car. There was no question as to Phelps's liability for the accident. Coomer was treated that same night at the Lake Cumberland Regional Hospital Emergency Room and was diagnosed with a bruised knee by the emergency room physician. She was sent home from the hospital with a prescription for Tylenol–3, which contains codeine, for her pain.

On July 26, 2001, Phelps reported the accident to his insurer, Progressive. That same day, a representative of Progressive contacted Coomer for the purpose of settling her bodily injury claim against Phelps. After questioning Coomer as to the extent of her injuries, Progressive's agent offered a settlement of $250.00 in exchange for a full release of her claims.

Coomer rejected the offer, informing the agent that she would contact the company later to discuss any settlement. That same afternoon, Coomer telephoned Progressive to discuss her claim, stating that she would accept a $500.00 settlement in exchange for her release. Progressive agreed to Coomer's offer of settlement, and an agent for the company traveled to her house that evening to obtain her release. While the agent was at her home, Coomer executed a full release in favor of Phelps and Progressive in exchange for a check in the amount of $500.00. Coomer deposited the check in her bank account later in the week. There is no evidence that Progressive contacted either Coomer's treating physician or Lake Cumberland Regional Hospital in preparation for or in anticipation of settlement of her claim.

Approximately one week later, Coomer learned that the physician who had treated her on the night of the accident had misdiagnosed her injury as a bruised knee when, in fact, her leg had been fractured. She initiated a lawsuit against Phelps in the Pulaski Circuit Court, claiming damages resulting from the injuries she sustained in the car accident. Nearly a year later, Coomer amended her original complaint, naming Progressive as a Defendant and alleging the company had engaged in bad faith during the settlement of her claim. Shortly thereafter, Phelps filed, and Progressive joined, a motion for summary judgment in the Circuit Court. That motion was granted as to both defendants and was subsequently affirmed by the Court of Appeals. This Court granted discretionary review to consider the case.

## III. ANALYSIS

### A. Validity of the Release

#### 1. Mutual Mistake

■ In arguing that the effectiveness of her release should be ignored under the doctrine of mutual mistake, Coomer essentially asks us to overturn a long-standing rule of Kentucky law. In *Trevathan v. Tesseneer*, 519 S.W.2d 614 (Ky.1975), our predecessor Court held that a mutual mistake between parties to a release as to the "nature and extent of [the Plaintiff's] injuries" was insufficient grounds on which to invalidate a general release. *Id.* at 615. To retreat from this rule would cast great doubt on the finality of releases in this state and unnecessarily complicate settlement considerations. As the Court noted in *Trevathan*, "[t]his rule favors the orderly settlement of disputes and avoids multiplicity of suits and the chaos which would result if the releases were not treated seriously by the courts." *Id.* at 616. We see no need to retreat from this rule, thus we expressly reaffirm the holding of *Trevathan*.[1]

■ In an effort to avoid this result, Coomer has also attempted to distinguish her case from *Trevathan*. Coomer argues that she was suffering from a misdiagnosed, patent injury whereas the plaintiff in *Trevathan* sought to invalidate her release on the basis of an undiagnosed, latent injury that did not manifest until several months after the release was executed. This is a distinction without a difference. Absent fraud, incapacity, or other compelling evidence of wrongdoing, an injured party who executes a release of claims is bound by the terms of that release. This rule applies regardless of how the subsequently discovered injuries

1. While it might be argued that this case involved a unilateral mistake on the part of Coomer, and not a mutual mistake as she alleges, we need not reach that issue having reaffirmed *Trevathan*.

might have been characterized at the time of the release.

Coomer argues that this Court should follow a recent trend in the law of other jurisdictions to recognize mutual mistake as a proper ground for invalidating a release. She also cites a decision of the Court of Appeals, *Kendrick v. Bailey Vault Co., Inc.*, 944 S.W.2d 147 (Ky.App. 1997), that invalidated a workers' compensation settlement on the basis of mutual mistake or constructive fraud,[2] as an example of this trend. *Kendrick*, however, involved a dispute over workers' compensation, an area that is governed by its own extensive and distinct body of law. This distinction was acknowledged, at least implicitly, by the Court of Appeals, which justified application of the mutual mistake doctrine in *Kendrick* because it was "in line with the workers' compensation goal that injured workers receive the benefits to which they are entitled." *Id.* at 150. The application of mutual mistake in the context of these cases can be fairly attributed to "the peculiar nature of workers' compensation." *AIK Selective Self Ins. Fund v. Bush,* 74 S.W.3d 251, 257 (Ky. 2002). Thus, despite some similarity between the facts in *Kendrick* and in this case, *Kendrick's* use of the mutual mistake doctrine is limited to the field of workers' compensation and has no applicability outside that field.[3]

## 2. Constructive Fraud

■ As an alternative to her theory of mutual mistake, Coomer argues that the doctrine of constructive fraud should apply to invalidate her release. At the outset, it is important to note that Coomer has never alleged that Phelps or Progressive engaged in actual fraud in procuring her release. That being said, Coomer contends that the doctrine of constructive fraud should apply to invalidate her release.

Coomer again cites *Kendrick* for the proposition that constructive fraud may be sufficient to invalidate a settlement agreement. In *Kendrick,* as mentioned above, the Court of Appeals invoked the doctrine of constructive fraud (along with mutual mistake) to invalidate a settlement between the claimant and the insurance company. In that case, both parties relied, at least in part, on the optimistic, but incorrect, prognosis of the claimant's physician. The Court of Appeals indicated that the insurance company's reliance on the opinion of the claimant's doctor created, in essence, an agency relationship between the company and the doctor. Consequently, the doctor's medical misrepresentation was imputed to the insurance company, thus allowing the worker to claim constructive fraud. As noted in the previous section, however, the holding in *Kendrick* is limited to the context of workers' compensation cases and is not applicable to this case.[4]

This does not mean that the doctrine of constructive fraud is inapplicable to cases outside of the workers' compensation field. *Wood v. Kirby,* 566 S.W.2d 751 (Ky.1978), which was cited by the Court of Appeals in

**2.** Ultimately, the Court did not choose between the two theories to justify its reversal, though it did note that proceeding under "mutual mistake" might be "more apropos...." *Kendrick,* 944 S.W.2d at 150.

**3.** Since the issue of mutual mistake in a workers' compensation case is not before this Court, we do not express an opinion on the

soundness of the Court of Appeals' holding in *Kendrick.*

**4.** Again, since the issue of constructive fraud in a workers' compensation case is not before this Court, we express no opinion as to the soundness of that portion of the Court of Appeals' holding in *Kendrick.*

*Kendrick,* sets out a useful definition of constructive fraud, "Constructive fraud arises through some breach of a legal duty which, irrespective of moral guilt, the law would pronounce fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Wood,* 566 S.W.2d at 755. Coomer has acknowledged in her brief that "a presumption of fraud does not arise out of the bare fact that consideration was inadequate; inadequacy alone is not sufficient to show fraud in law or equity." (Appellant's Br. at 14 (internal citations omitted).) Despite having correctly stated this point of law, she has failed to identify a legal duty that either Phelps or Progressive can be said to have violated. Such a violation is a necessary prerequisite for any action premised on constructive fraud. Coomer has failed to produce any evidence that Phelps or Progressive violated any legal duty owed to her. As such, summary judgment on the issue of constructive fraud was proper.

### 3. Coomer's Alleged Incapacity

■ Coomer also alleges that the release was ineffective due to her mental incapacity at the time of its execution. She claims this incapacity resulted from a combination of the severe pain of her injury and the medication she was prescribed for treatment of that pain. Our cases have allowed that incapacity, when properly proven, may provide sufficient grounds to invalidate a release. *Louisville & Nashville R. Co. v. Lee,* 154 Ky. 226, 157 S.W. 60, 62 (1913). This position was acknowledged in *Trevathan v. Tesseneer,* 519 S.W.2d 614 (Ky.1975), where the Court noted that "[s]ince the record is devoid of any indication of fraud, overreaching, or

*physical impairment at the time of execution,* the simple question becomes whether ... it may be invalidated on the ground of mutual mistake." *Id.* at 615 (emphasis added). As the Court of Appeals correctly noted in its opinion, the prerequisite for capacity to execute a personal release is the same as that required for any contract.

Coomer's bald allegation of incapacity, however, is insufficient to overcome the motion for summary judgment. Coomer claims she was incompetent to execute the release because she was experiencing a great deal of pain from the accident, was prescribed and took more than the recommended dose of Tylenol–3,[5] and does not remember reading or executing the release.

As noted by the Court of Appeals, even though Coomer claims no recollection of reading or executing the release, she could remember calling the adjuster's associate and offering to settle her claim for $500.00, she could remember the adjuster returning to her home with the check, and she acknowledges that her signature appears on the release. Furthermore, when describing in her deposition the face-to-face encounter with the adjuster, she stated: "He come in and I signed the release. *He wished me good luck.*" (Emphasis added.) Although she maintained that she did not remember reading the release, when asked if she thought she would have read it, she responded: "I'm quite sure I would have."

Coomer's own testimony shows that she telephoned Progressive on her own initiative, that she was lucid enough to negotiate a settlement twice that originally offered by the company, that she recalls the negotiations, that she recalls the adjuster coming to her house, and that she signed and

5. Though she notes her use of the narcotic, Tylenol–3, in support of her claim of incapacity, Coomer asserts no specific claim that she was so intoxicated that this factor alone would support invalidating the release.

likely would have read the release. Though she claims not to remember actually reading or signing the release, her recollection of other events surrounding her execution of the release are detailed, to say the least.

We also note that Coomer cashed the settlement check a day or two after executing the release. Additionally, the insurance adjuster's sworn affidavit states that he found no reason to doubt Coomer's capacity or suspect that she was intoxicated. Furthermore, Coomer has admitted that the $500.00 settlement was fair given what she believed at the time was a minor injury.

Even having reviewed the record in a light most favorable to Coomer, it is clear to this Court that she has failed to establish a genuine issue of material fact as to her competence to execute the release. This is insufficient to overcome summary judgment under *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991). Summary judgment on this issue was proper.

## B. Bad Faith

■ In addition to her suit for damages against Phelps, Coomer claims that Progressive acted in bad faith in obtaining her release as prohibited by the Unfair Claims Settlement Practices Act ("UCSPA"). KRS 304.12–230. While an action for damages premised on violations of this statute is clearly permitted under Kentucky law, *see State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116 (Ky.1989) (permitting a private right of action for violations of KRS § 304.12–230 pursuant to KRS § 446.070), such a claim does not lie in this case. Where, as here, an insurance company has promptly agreed to a reasonable offer of settlement *proposed* by an injured third party and there is no indication of fraud, there is no actionable claim for bad faith under the statute.

Coomer alleges that Progressive violated the UCSPA's prohibition of bad faith in two ways. Specifically, she contends that Progressive acted in bad faith by failing to thoroughly investigate the merits of her claim before agreeing to settle and by providing a settlement that was not "fair and equitable." KRS 304.12–230(6).

In arguing that Progressive failed to adequately investigate her settlement claim, Coomer relies on the combined authority of subsections three and four of the UCSPA, each of which sets forth an example of an unfair settlement practice. *See* KRS 304.12–230(3) ("[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies"); KRS 304.12–230(4) ("[r]efusing to pay claims without conducting a reasonable investigation based upon all available information"). Based on the preceding subsections of the Act, Coomer would have this court impose a duty on insurers to investigate the validity of any and all statements offered to support claims by injured third parties during settlement negotiations. While KRS 304.12–230(4) prohibits any refusal to pay a claim without first conducting a reasonable investigation, no such obligation arises for an insurer that has agreed to the payment demands of an injured party. Such a duty to "double-check" the basis of third party claims would significantly and erroneously broaden an insurer's obligation of good faith as set forth in the statute. *See Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky.1997) ("The UCSPA does not require that a claim be evaluated, or that it be evaluated correctly. It only requires that payment of a claim not be refused without conducting a reasonable investigation based on all available information.").

Coomer's second contention, that KRS 304.12–230(6) imposes a broad obligation

on insurers to reach settlements that are "fair and equitable," is equally without merit. The full text of KRS 304.12–230(6) is as follows: "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." This does not necessarily mean that an insurer's proposed settlement amount must always provide wholly accurate or complete compensation for an injury. The statute only requires that an insurer make a good faith attempt to settle any claim, for which liability is beyond dispute, for a reasonable amount. The language of this provision is simply inadequate to establish a broad-based requirement that insurance settlements must always be "fair and equitable" in the traditional sense. Where, as here, there is no question of liability, settlement *actually occurred* within one day of the accident, and, as admitted by the claimant, the settlement was "fair" in light of the information known at the time, no action for bad faith exists under KRS 304.12–230(6).

In short, Coomer insists on an unprecedented, unwarranted, and unwise expansion of the statutory bad faith cause of action. She simply cannot claim bad faith on the part of Progressive when she received a settlement for the amount she demanded. With the benefit of hindsight, it is easy to conclude that Coomer would have been wise to avoid such a settlement, but improvidence alone is insufficient to justify a bad faith claim.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

All concur.