RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0176a.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

CYNTHIA PHELPS,

    *Plaintiff-Appellant,*

  *v.*

  No. 10-6085

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

    *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:07-cv-291—Charles R. Simpson III, District Judge.

Decided and Filed: June 13, 2012

Before: BATCHELDER, Chief Judge; CLAY and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Sara B. Gregory, Lance W. Turner, Thomas E. Carroll, CARROLL &
TURNER, P.S.C., Monticello, Kentucky, for Appellant. David T. Klapheke, BOEHL
STOPHER & GRAVES, LLP, Louisville, Kentucky, for Appellee.

  GILMAN, J., delivered the opinion of the court in which CLAY, J., joined.
BATCHELDER, C. J. (pp. 15–19), delivered a separate dissenting opinion.

_____

**AMENDED OPINION**

_____

  RONALD LEE GILMAN, Circuit Judge. Cynthia Phelps alleges that State Farm
Mutual Automobile Insurance Company violated Kentucky's Unfair Claims Settlement
Practices Act (UCSPA) in its processing of her third-party insurance claim. The district
court granted summary judgment in favor of State Farm on the ground that Phelps had failed
to present sufficient evidence to show that the three years taken to settle her claim raised a
genuine dispute as to whether State Farm had acted in bad faith. For the reasons set forth

1

below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises out of an automobile accident that occurred on July 18, 2003. As Phelps was pulling into a gas station in Jefferson County, Kentucky, Lindsey Kirby pulled out of the station in front of Phelps without warning. The two cars collided, causing injuries to Phelps's spine that ultimately required surgery in October 2003. Kirby was insured by State Farm under an automobile insurance policy with a $50,000 limit of liability. State Farm concedes that Kirby was at fault for the accident and that State Farm was obligated to provide the insurance coverage.

Not long after the accident, Phelps filed a third-party liability claim with State Farm for personal injuries and property damage arising out of the accident. Adjuster Denise Ray was assigned to the claim. Ray sent Phelps a medical-authorization form in September 2003, which Phelps signed and returned that same month. On October 2, 2003, State Farm transferred Phelps's claim to a second adjuster, Bob Nieses. Nieses sent Phelps's counsel, Thomas Carroll, a letter requesting a list of Phelps's medical providers. Nieses received a response within two weeks. He then began collecting Phelps's medical records.

Phelps's claim file shows minimal activity until February 11, 2004, when State Farm first noted that Phelps had a prior back injury in 1999 in the same part of her body as the present injury. Nieses determined that additional information was needed to evaluate Phelps's claim and to separate any prior injuries from the current claim. His file note indicates: "Need to gather information on wage loss, medical bills, and prior condition." But there is no evidence that Phelps was made aware of State Farm's need for this information at the time.

Carroll submitted a "settlement package" that was received by State Farm on April 2, 2004. The package included documentation regarding Phelps's surgery and related medical and wage-loss costs totaling $22,620.22. The package did not include a demand,

but it expressed Phelps's interest in reaching a settlement and made a request for information about State Farm's policy limits.

State Farm apparently did little to process Phelps's claim for several months after receiving her settlement package. Nieses testified in his deposition that he did not complete a claim valuation because he considered it "premature" due to the outstanding information about Phelps's 1999 back injury. In July 2004, State Farm substituted yet another adjuster, Amy Lirely, to process Phelps's claim. On September 14, 2004, Lirely requested information from Phelps's attorney about the 1999 injury. State Farm allegedly "received permission to examine PIP [personal injury protection] records" relating to Phelps six days later, but neither party has explained what these records covered.

By October 24, 2004, State Farm had received the medical records relevant to Phelps's 1999 injury. But State Farm contends that the records it received covered only Phelps's immediate treatment following the 1999 injury and did not include documentation about her treatment in the years following that injury. Lirely testified that the missing information was relevant to determine how well Phelps had recovered from the 1999 injury by the time of the present accident. Nonetheless, Lirely proceeded to complete a claim evaluation based on the available records, valuing Phelps's claim between $24,620 and $49,620. Phelps argues that this range was outrageously low given the documentation that State Farm had before it.

State Farm made an initial settlement offer of $25,000 four days later, on October 28, 2004. According to State Farm, its offer did not include compensation for future wage loss or future impairment of earnings because Phelps failed to include any such information in her settlement package. In addition, medical records from December 2003 indicated to State Farm's adjusters that Phelps had substantially recovered from her July 2003 injury and probably would not experience any future impairments.

Carroll did not directly respond to State Farm's offer, but Phelps contends that Carroll made additional requests for State Farm to reveal its policy limits over the course of the fall and that Lirely refused to provide this information. Lirely, however, disputes ever

being asked about the policy limits. In any event, having heard nothing from Carroll about her offer, Lirely left a phone message for him in January 2005, but the call was not returned.

On March 29, 2005, Lirely finally heard from Carroll, who rejected State Farm's $25,000 offer and demanded $150,000 to settle the claim. Although State Farm criticizes Carroll for making a demand that far exceeded the policy limits, there is no evidence that Lirely contemporaneously told Carroll that the demand in fact exceeded the policy limits or that Lirely disclosed any information about the policy limits.

Phelps eventually filed suit against Kirby, the driver insured by State Farm, in Kentucky state court in May 2005. In late May and early June, State Farm's attorney submitted discovery requests to Carroll. Carroll did not respond to these requests until October 25, 2005. State Farm asserts that the discovery produced pertinent new information, including a comprehensive medical-records release and wage-loss documentation. But Phelps contends that the information obtained through discovery was not necessary to the adjudication of her claim and that State Farm had all of the pertinent information that it needed as of April 2, 2004, when it received the settlement package (or, at the very latest, as of October 24, 2004, when it received information about Phelps's 1999 injury).

On November 3, 2005, State Farm once again replaced Phelps's claims adjuster, this time assigning the claim to Lillian Jones. Meanwhile, discovery in the pending lawsuit continued through the winter. Phelps was deposed on March 22, 2006. She testified that she had fully recovered from her 1999 injury prior to the 2003 accident. State Farm's attorney determined that Phelps was a credible witness and recommended that State Farm increase its settlement offer.

Carroll first demanded the policy-limits amount of $50,000 on April 11, 2006. State Farm countered with an offer of $40,000 the following day, which Carroll rejected. Finally, State Farm offered $50,000, the full policy limits, on April 13, 2006. Phelps accepted the offer shortly thereafter, which resolved her pending suit against Kirby.

In May 2007, Phelps filed the present lawsuit, alleging that State Farm had violated Kentucky's UCSPA through its conduct in processing her claim. The lawsuit originated in

state court, but State Farm removed the case to the United States District Court for the Western District of Kentucky based on diversity jurisdiction. Following discovery, State Farm filed a motion for summary judgment. Phelps relied in her response on the testimony of two expert witnesses, Gary Fye and David Huff, concerning the allegedly unreasonable claims-handling practices of State Farm.

In his report, Fye describes himself as a "national claim handling expert," presently employed as a claim-practices analyst at the Gary T. Fye Company. He has previously worked as a licensed independent analyst and as a claims adjuster or manager for four different insurance companies. His educational background is varied, but largely unrelated to the insurance industry (with the exception of some course work in Business Administration). Fye has also participated in several dozen insurance-related educational programs, given a multitude of presentations, and offered expert testimony in many federal and state court cases.

His report provides background information on the insurance industry and State Farm's general methods for handling claims, focusing on its financial motivations. With respect to Phelps's claims, Fye presented the following opinions:

> State Farm treated this claim as an opportunity to seek an underpayment by unreasonably making and maintaining a lowball offer to the claimant, whom it considered an adversary. BI [(Bodily Injury)] liability coverage is meant to pay the sums owed by Kirby, within the policy limit, without a delay or a trial. It appears State Farm attempted to achieve its own outcome goals by freezing its assessment of the range of value and not moving.

> State Farm incorrectly substituted its own subjective and unreasonable value for the claim. State Farm offered what its adjuster felt the beginning point of negotiations should be, but didn't investigate what a jury might find. It particularly avoided obtaining an Independent Medical Examination (IME) that could only support the claimant's position with regard to the longer term effects of this type of injury. Knowing that a jury's determination forms the basis of recovery under this particular coverage, the file should have the facts that support paying the claim, not just facts that suggest not paying it.

> This claim became a limit claim on October 15, 2003 when Ms. Phelps had lumbar spine surgery. There was no "new information" in terms of evaluation. State Farm made no attempt to use the policy to soften the financial consequences of the accident for her. It withheld its limit

information, and stood on its lowball subjective offer of $25,000 in the face of what amounted to authority for the policy limit. Even when it paid the policy limit, it tried to save $10,000 first. State Farm knew or should have known during this time that it was at risk of extracontractual liabilities for both it and its insured while adopting this stonewall position in non-compliance with Kentucky's rules for fair claim-handling.

State Farm's redesigned claim operations and performance-based pay programs undercut Kentucky's insurance laws and the purpose of BI liability insurance. State Farm is aware of this, yet its programs remain undisclosed to the insuring public both at point of sale and when a claim is reported.

Among the affirmative duties of an insurer is to fulfill the purposes of the coverage. State Farm's handling of the Phelps case did not provide the level of service the public should expect from an insurer.

Huff, Phelps's other expert witness, is the CEO of Integrated Risk Management, Inc., a business consulting firm. His background includes positions in the legal and insurance departments of different businesses and in private legal practice. He has received several insurance-related certifications and is a member of numerous professional organizations in the insurance industry. Huff graduated with a bachelor of arts degree from Berea College in Kentucky and a law degree from the University of Kentucky College of Law. His report states: "[I]t is my opinion that State Farm . . . acted in bad faith by failing to fulfill its obligation under its insurance policy to pay Cynthia Phelps for her damages and injuries in a reasonable and timely manner and State Farm knew or should have known that it had no reasonable basis in law or fact for such a failure." He then notes in a bulleted list the facts from the record that he believes supports this conclusion.

The district court granted summary judgment in favor of State Farm without discussing the testimony of either of Phelps's expert witnesses. It concluded that all reasonable jurors would find that the delay in processing Phelps's claim was solely attributable to Phelps's own counsel and to the time reasonably needed for State Farm's investigation. The court also found that Phelps had failed to prove that an improper purpose—rather than a lack of evidence—drove State Farm's allegedly low settlement offers. This timely appeal followed.

## II. ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *ACLU of Ky. v. Grayson Cnty., Ky.*, 591 F.3d 837, 843 (6th Cir. 2010). Summary judgment is proper where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    Kentucky's Unfair Claims Settlement Practices Act

Kentucky's UCSPA is intended "to protect the public from unfair trade practices and fraud," *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988), and "imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured," *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006). The UCSPA fundamentally requires that "a good faith attempt be made to effectuate a prompt, fair and equitable settlement." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999); *accord Coomer v. Phelps*, 172 S.W.3d 389, 395 (Ky. 2005). Moreover, the UCSPA "should be liberally construed so as to effectuate its purpose." *Reeder*, 763 S.W.2d at 118.

Insurances companies are prohibited by the UCSPA from engaging in 14 specific unfair practices. Ky. Rev. Stat. § 304.12-230. Phelps alleges that State Farm violated the following subsections:

> (3)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>
> (4)    Refusing to pay claims without conducting a reasonable investigation based upon all available information; . . .

> (6)    Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; [and]
>
> (7)    Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

*Id.* § 304.12-230. An insurance company's violation of the UCSPA creates a private cause of action both for the named insured and for those who have claims against named insureds, and the same standards govern both types of cases. *Motorists Mut.*, 996 S.W.2d at 452; *see also King v. Liberty Mut. Ins. Co.*, 54 F. App'x 833, 836 (6th Cir. 2003).

In order to state a claim under the UCSPA, Phelps must meet a high threshold standard that requires evidence of "intentional misconduct or reckless disregard of the rights of an insured or a claimant" by the insurance company that would support an award of punitive damages. *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (describing this standard as that of "outrageous" conduct by the insurance company); *United Services Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (describing the threshold showing as "high indeed"). After meeting this initial showing, Phelps must establish the following three elements of a bad-faith claim:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer*, 864 S.W.2d at 890 (internal quotation marks omitted); *accord Motorists Mut.*, 996 S.W.2d at 452; *Med. Protective Co. v. Wiles*, --- S.W.3d ---, 2011 WL 2420011, at *6 (Ky. Ct. App. Oct. 21, 2011). Oddly, the second and third elements of this test depend on evidence similar to the threshold inquiry. *King*, 54 F. App'x at 838.

"The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its

conduct was unreasonable." *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000) (internal quotation marks omitted).  Evidence about problematic "settlement behavior during litigation" may be considered as part of this inquiry.  *Knotts*, 197 S.W.3d at 517, 522-23 (internal quotation marks omitted).

The Kentucky Supreme Court has cautioned insurance companies that "coming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case." *Farmland Mut.*, 36 S.W.3d at 376 (internal quotation marks omitted); *cf. Wittmer*, 864 S.W.2d at 892 (suggesting that a low offer might serve as evidence of bad faith). To comply with their obligations under the statute, insurers "should not force an insured to go [through] needless adversarial hoops to achieve [her] rights under the policy.  [They] cannot lowball claims or delay claims hoping that the insured will settle for less." *Farmland Mut.*, 36 S.W.3d at 376 (internal quotation marks omitted).

But "mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception. . . . or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Motorists Mut.*, 996 S.W.2d at 452-53 (citation omitted).  Nor is the insurer's below-policy-limits offer considered evidence of bad faith per se, particularly where "the claimants never demanded payment of the policy limits or any other sum." *Id.* at 453 (emphasis omitted); *see also Coomer*, 172 S.W.3d at 395 (noting that the UCSPA does not require that settlement offers "always provide wholly accurate or complete compensation for an injury").  And an insurer may refuse a demand exceeding the policy limits without running afoul of the UCSPA. *Motorists Mut.*, 996 S.W.2d at 453.

In addition, an insurer is entitled to challenge a claim through litigation if the claim is "fairly debatable," *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.*, 880 S.W.2d 886, 889-90 (Ky. Ct. App. 1994), on either "the law or the facts." *Wittmer*, 864 S.W.2d at 890 (internal quotation marks omitted).  The Kentucky Supreme Court revisited the definition of "fairly debatable" in *Farmland Mutual*, which clarified that "*Empire Fire* does not stand for the proposition . . . that a disputed factual matter requires

dismissal of a bad faith claim as a matter of law" and explained that "the existence of jury issues on the [underlying] contract claim does not preclude the bad faith claim." *Farmland Mut.*, 36 S.W.3d at 375. It distinguished *Empire Fire* as a case involving unresolved legal questions about the insurer's liability. *Id.* *Farmland Mutual* then held that "although elements of a claim may be 'fairly debatable,' an insurer must debate the matter fairly" and "still is obligated under the KUSCPA to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner." *Id.* Whether a claim may be considered "fairly debatable" is a question of fact for the jury. *Id.* at 376.

Finally, we note that our dissenting colleague's disagreement with the reversal of summary judgment in this case is primarily based on the "intentional misconduct or reckless disregard" standard for bad faith set forth in *Wittmer*, 864 S.W.2d at 890. We acknowledge that the Kentucky cases still recognize *Wittmer*'s punitive-damages standard despite the Kentucky Supreme Court's later pronouncement that "the appropriate inquiry is whether . . . the insurer acted unreasonably," *Farmland Mut.*, 36 S.W.3d at 375 (internal quotation marks omitted). *See, e.g.*, *Wiles*, 2011 WL 2420011, at *7-9. This strikes us as confusing because a claim will obviously meet *Farmland*'s lower standard of "unreasonableness" if it has first met *Wittmer*'s higher standard of "reckless disregard." *Wittmer*'s threshold inquiry thus appears to render superfluous the merits inquiry into an insurance company's alleged bad faith. In any event, this seems to be the current state of Kentucky law.

But even after acknowledging that Phelps has to meet *Wittmer*'s higher threshold standard, we believe that the facts here would allow reasonable jurors to so find. This is not to say that they must—or even that they will—find for Phelps, but simply that we believe that the district court erred in concluding that no reasonable juror could find that Phelps has met this standard based on the analysis set forth in Part II.C. below.

## C.      Summary judgment on Phelps's UCSPA claim was improper

The district court granted summary judgment for State Farm because it concluded that Phelps had failed to present sufficient evidence that State Farm acted unreasonably in the processing of her claim. *See Farmland Mut.*, 36 S.W.3d at 375. But the district court's

opinion draws inferences that favor State Farm rather than Phelps, and it failed to consider—or explain why it did not consider—Phelps's expert-witness testimony. In our view, Phelps presented sufficient evidence to raise a genuine dispute as to whether State Farm violated the UCSPA in handling her claim.

First, State Farm's initial offer of $25,000 was just barely above the low end of both its own evaluation of the claim ($24,620 to $49,620) and Phelps's documentation of medical and wage-loss costs ($22,620.22). The offer failed to reasonably account for Phelps's pain and suffering or future wage loss. Although State Farm argues that it was not required to include these items in its settlement offer because Phelps had not provided any proof of her pain and suffering or future wage loss, that does not excuse State Farm's failure to include an approximate amount for these damages based on a likely jury verdict. *See Farmland Mut.*, 36 S.W.3d at 375-76 (explaining that an insurer "cannot lowball claims . . . hoping that the insured will settle for less," and it instead must "attempt to settle the claim in a fair and reasonable manner" (internal quotation marks omitted)); *Motorists Mut.*, 996 S.W.2d at 454 (cautioning that, although the "UCSPA does not require that a claim be evaluated, or that it be evaluated correctly," it does require "that a good faith attempt be made to effectuate a prompt, fair and equitable settlement"). And State Farm has offered no other explanation for its low offer. Whether State Farm recklessly disregarded Phelps's rights when it failed to include these damages in its initial settlement offer thus presents a question of fact for the jury.

Another ground on which a jury could reasonably find that State Farm exhibited bad faith is the extensive delay of nearly three years before Phelps's claim was settled. *See id.* at 376 (providing that an insurer "cannot . . . delay claims"). Several cases have determined that delays of substantially shorter length constitute more than "mere delay" and instead may serve as evidence of bad faith. *See Med. Protective Co. v. Wiles*, --- S.W.3d ---, 2011 WL 2420011, at *9 (Ky. Ct. App. Oct. 21, 2011) (involving a delay of 27 months between the injury and the initial settlement offer); *King v. Liberty Mut. Ins. Co.*, 54 F. App'x 833, 837-38 (6th Cir. 2003) (involving a delay of 18 months from the date of a follow-up inquiry about the settlement through the date that the company finally checked its purged files).

Although the early months of the claims process—from September 2003 through February 2004—may be attributed to the time needed for a reasonable investigation, a legitimate question arises as to whether the delay involved in obtaining records from Phelps's 1999 injury recklessly disregarded Phelps's rights. State Farm first noted this earlier injury in its February 11, 2004 log notes, but there is no evidence that records were requested from Phelps until September of that year. There is no explanation in the record for this six-and-a-half month delay beyond the fact that the claims adjuster was replaced for the second time in the interim. *Cf. King*, 54 F. App'x at 837-38 (concluding that an 18-month delay for investigatory purposes was unreasonable).

State Farm's position that this information was necessary to evaluate Phelps's claim may also be construed as a delay tactic. Viewing the facts in the light most favorable to Phelps, the settlement package submitted in March 2004 included all of the information needed to settle her claim. The jury may infer that State Farm raised the prior-injury issue at this time in order to delay making a settlement offer. This inference is bolstered by the fact that State Farm had access to databases reporting prior insurance claims and could have uncovered the existence of Phelps's 1999 injury well before receiving her allegedly deficient medical records. Similarly, adjustor Nieses's refusal to complete an initial valuation before receiving these records—on the ground that such an evaluation would be "premature" (despite the fact that settlements are often reached at premature stages in litigation)—could also be considered a delay tactic.

Phelps's case further involves some general evidence of delay tactics, some questionable delays in the processing of her claim, and a nearly three-year delay before payment. We recognize, of course, that some of the delay in this case is due to the apparent lack of diligence by Phelps's own counsel. But the majority of the delay, when viewed in the light most favorable to Phelps, seems fairly attributable to State Farm.

Another inference of bad faith arises from State Farm's prolonged refusal to disclose its policy limits, particularly after Carroll made a demand that far exceeded the limit. State Farm disputes whether any request to disclose policy limits was ever made, but the district court was obligated to view the record in the light most favorable to Phelps when

considering State Farm's motion for summary judgment. In addition, State Farm argues that it was not required under Kentucky law to disclose its policy limits, a contention for which State Farm offers no support but to which Carroll conceded during his deposition. But even if an insurer is not generally obligated to *disclose* its policy limits, the failure to promptly *offer* its limits as soon as it knows or should have known that a reasonable evaluation of the claim is in excess of the limit could support an inference that State Farm was not attempting to negotiate in good faith. *Cf. Coppage v. Firemen's Fund Ins. Co.*, 379 F.2d 621, 624 n.3 (6th Cir. 1967) (declining to hold under Tennessee law that "an insurer has a general duty to disclose policy limits," but determining that "on the record before us, the withholding of this information was a circumstance which the jury could consider on the question of bad faith").

The record further includes some evidence of troubling claims-handling practices by State Farm both in this case and in general. These include switching claims adjustors four times without explanation, habitually making offers at the low end of valuation ranges, refusing to increase an offer without documentation of additional damages, failing to ask Phelps to submit to an independent medical examination, and failing to include facts in the claim file that would support a jury verdict in Phelps's favor. Two of these practices—extending low offers and refusing to increase the valuation range—find support in the deposition testimony of State Farm's own claims adjustors.

Finally, we note the critique of State Farm's handling of the claim in question that is documented in the reports from Phelps's expert witnesses Fye and Huff, which the district court totally failed to consider. State Farm did not move to exclude the testimony of these experts, and Phelps relied on their reports in her response to State Farm's motion for summary judgment. The district court therefore had a duty to at least address their reports. *See* Fed. R. Civ. P. 56(c)(3) (mandating that "[t]he court need consider only the cited materials" in the parties' briefs); *see also Logan v. Denny's Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) (finding that "the district court's analysis . . . [is] in complete contravention to the requirement that the evidence—all of the evidence—be viewed in the light most favorable to the nonmoving party" on summary judgment). Its failure to do so is troubling, especially

because the opinions of the two expert witnesses raise a genuine dispute as to State Farm's compliance with the UCSPA in this case.

All of this is not to say that a jury will ultimately find that State Farm violated the UCSPA by processing Phelps's claim in bad faith.  But the evidence presented by Phelps is sufficient to raise a genuine dispute as to this issue.  The proof, in other words, is not "so one-sided that [State Farm] must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

—————————————

**AMENDED DISSENT**

—————————————

ALICE M. BATCHELDER, Chief Judge, dissenting. I respectfully, though strongly, dissent from the majority's decision to reverse the district court's summary judgment order because there is simply no evidence in the record establishing that State Farm acted in bad faith. The majority completely misapplies the Kentucky Supreme Court's requirement that "[b]efore [a] cause of action [under the U.C.S.P.A.] exists in the first place, there must be evidence sufficient to warrant punitive damages," which requires proof that is "sufficient for the jury to conclude that there was conduct that is outrageous[] because of the defendant's evil motive or his reckless indifference to the rights of others." *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (internal citation and quotation marks omitted). Phelps has failed to make this threshold showing. On summary judgment, Phelps must "do more than simply show that there is some metaphysical doubt as to the material facts"—she must present specific facts establishing bad faith. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). She has wholly failed to do so. The majority infers bad faith from four of State Farm's actions, but even when those actions are viewed in the light most favorable to Phelps, they are insufficient to establish bad faith of an outrageous nature.

First, the $25,000 settlement offer is insufficient to establish bad faith because it adequately accounted for Phelps's claimed loss. Phelps gave State Farm documentation indicating that her actual damages were $22,620.22, and, as the majority recognizes, Phelps did not provide any documentation of her pain and suffering or future wage loss. Nevertheless, the majority faults State Farm for failing to include in its offer "an approximate amount for these damages based on a likely jury verdict." This conclusion completely overlooks State Farm's evaluation range, from which State Farm derived the $25,000 offer. In this evaluation, State Farm explicitly accounts for pain and suffering. Moreover, even though Kentucky does not require an insurance settlement offer to include

a jury verdict estimate, the record shows that in creating its evaluation range for her claim, State Farm did account for how a jury would consider Phelps's medical evidence.

Considering these facts in the light most favorable to Phelps does not establish that State Farm's initial offer was in bad faith. Though the offer was at the low end of the evaluation range, it covered the cost of Phelps's past medical bills and lost wages, which was the only documented loss that State Farm had at the time it made the offer. "[C]oming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case." *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000) (internal quotation marks and citation omitted). But the evidence that State Farm had at the time of the offer, viewed in the light most favorable to Phelps, does not indicate the outrageous conduct or reckless disregard for her rights that is necessary for a bad faith claim under the U.C.S.P.A. The offer included the only documented damages that State Farm was aware of, and Phelps has not presented specific facts from either her medical documents or her experts showing that State Farm deliberately neglected to include additional damages in the offer.

Second, the delays along the way of the settlement process are likewise not indicative of bad faith. The majority exaggerates the importance of the various delays during Phelps's settlement by grouping them together as one "nearly three-year long delay," when the majority's main concern rests on only one particular instance of delay—the delay between February 11, 2004, and September 23, 2004. Even considering the entire three-year settlement process as a delay is insufficient to establish bad faith absent evidence of evil motive or reckless indifference to Phelps's rights. *See United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) ("Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith."). Though the majority cites two non-binding cases to support its conclusion that the overall time to settle was too long, those cases involve delays that are accompanied with evidence of improper motive or reckless indifference. *See Med. Protective Co. v. Wiles*, No. 2010-CA-000262, 2011 WL 2420011, at \*8–9 (Ky. Ct. App. Oct. 21, 2011) (finding evidence of "questionable motive" and stating that "it must be kept in mind that mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or

deception. . . . In other words, there must be proof or evidence supporting a reasonable inference that the purpose of delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage" (internal citation omitted)); *King v. Liberty Mut. Ins. Co.*, 54 F. App'x 833, 837–38 (6th Cir. 2003) (finding evidence of reckless disregard for the claimant's rights where the insurer refused to acknowledge a prior settlement agreement that the insurer had in its own files and failed to search those files for 18 months, and where there were disputed facts regarding an employee's knowledge of the prior settlement).

After faulting the three-year settlement process, the majority discusses its main concern—the February to September 2004 delay, during which time State Farm was gathering information regarding Phelps's prior spine injuries. The majority concludes that this delay was in reckless disregard of Phelps's rights because information regarding Phelps's prior medical history was not necessary to evaluate her claim. This conclusion, however, is incorrect because, at the very least, the information about her 1999 injury was relevant to State Farm's evaluation of the cause and extent of her 2003 injury because both injuries were to the same spinal region. The majority ignores this logical connection in favor of its conclusion that State Farm could have evaluated Phelps's claim without the 1999 records. Although State Farm could have chosen to evaluate the claim without the records, it does not necessarily follow that its decision to require the records was in bad faith. Rather, the 1999 records' relevance to the spinal region that was at issue in 2003 gave State Farm a reasonable basis in fact to request the records, and the mere delay in obtaining them does not alone indicate bad faith. *See United Servs. Auto. Ass'n*, 183 S.W.3d at 186 ("Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury. . . . Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.").

The majority infers that State Farm is disingenuous when it says that the delay was necessary to gather information regarding the 1999 injury because State Farm had access to a database that would have "uncovered the existence of Phelps's 1999 injury well before" receiving her medical records. However, State Farm already knew about the existence of

Phelps's prior spinal injury prior to receiving the medical records—that was why State Farm requested the records. To the extent the majority implies that the database would have given State Farm earlier information that would have been identical to the information it eventually learned from the medical records, that argument does not comport with the evidence in the record. Phelps's expert, Gary Fye, stated that State Farm has access to an external reporting service that would automatically inform State Farm whether Phelps had any prior injuries or claims; however, Fye stated that this service would not necessarily disclose information regarding the medical providers for those prior claims. Nor is there any information in the record that this service would disclose any of the details of the prior injury or claim that the medical records would have disclosed. Essentially, the index would have informed State Farm that there was a prior injury, and it may have given State Farm the names of the medical providers for that injury, but there is no indication that it would have given the details of the injury, as the majority suggests. Even viewed in the light most favorable to Phelps, this evidence does not indicate that the delay in obtaining her prior medical records constitutes the bad faith that she is required to show to establish her U.C.S.P.A. claim.

Third, the majority's conclusion that State Farm's failure to disclose its policy limit constitutes bad faith lacks any basis in law or logic. Viewing the evidence in Phelps's favor, and presuming for this purpose that Phelps's counsel, Carroll, had requested information regarding the policy limit, State Farm did not act in bad faith when it did not disclose it. Kentucky law does not require insurers to disclose their policy limits during settlement negotiations, and neither Phelps nor the majority have cited a Kentucky case that has indicated that failing to disclose a policy limit constitutes bad faith under the U.C.S.P.A. More importantly, Phelps has not presented any evidence to show that this failure to disclose the policy limit stemmed from State Farm's evil motive or reckless indifference to her rights. *See Wittmer*, 864 S.W.2d at 890. Without such evidence, the failure to disclose the policy limit cannot support an inference of bad faith under the U.C.S.P.A.

Moreover, the record shows that State Farm offered to pay its policy limit as soon as it knew that a reasonable evaluation of the claim was in excess of the limit—a practice that the majority concludes is proper. On March 23, 2006, State Farm indicated on its

activity log that its counsel believed Phelps "may be a limits case." On April 11, 2006, State Farm agent Jones received authority to increase the settlement offer to the $50,000 limit. Jones offered Carroll $40,000, which he refused and then demanded $50,000. State Farm responded by offering the policy limit, and on April 13, 2006, Carroll accepted on Phelps's behalf. Even viewing these facts in Phelps's favor, State Farm's failure to disclose the policy limits until its conclusion that she was a "limits case" does not establish bad faith. Instead, it is more indicative of State Farm's effort to engage in normal settlement negotiation strategy, typical in civil litigation.

Finally, the majority takes issue with some of State Farm's claims-handling practices but again fails to address how these practices exhibit the type of bad faith stemming from an evil motive or reckless indifference that Phelps needs to present. There is simply no evidence in the record, including Phelps's experts' depositions, that any of State Farm's actions rose to the level of bad faith that is required under the U.C.S.P.A. Phelps's experts do nothing more than make conclusory statements that State Farm acted with improper motives, and they do not present any evidence to support those conclusions other than their own inferences. "Although juries are generally free to believe expert witnesses, a plaintiff cannot survive summary judgment with an expert's bare opinion on the ultimate issue." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011) (internal citations omitted). Their reports and depositions discuss the training and resources available to State Farm agents, but that evidence does not establish evil motive or reckless indifference to claimants' rights, even when viewed in the light most favorable to Phelps.

By failing to apply Kentucky's law requiring that a bad faith claim must be supported by actual evidence of bad faith, the majority has opened the door to cries of "bad faith" each time a discontented claimant encounters delays and challenges prior to settlement. Therefore, I must respectfully dissent.